The PEOPLE of the State of Colorado,
Plaintiff–Appellee,

v.

Ricardo Lemar SAMUELS,
Defendant–Appellant.

No. 06CA1560.

Colorado Court of Appeals,
Div. VII.

Oct. 15, 2009.

Rehearing Denied Nov. 19, 2009.

murder (extreme indifference), one count of conspiracy to commit first degree murder, one count of possession of a weapon by a previous offender, and two crime of violence counts. We affirm.

## I. Background

At about 2:30 a.m. on March 26, 2005, J.C., a Bloods gang member, borrowed his sister's car intending to go to his girlfriend's house. He was dressed completely in red, the Bloods gang color. Before he left, he accidentally locked the keys in the car while the engine was running. After unsuccessfully trying to unlock the car door with a coat hanger, J.C. asked his sister for help, but she was unable to unlock it. He then called his mother. She and her boyfriend, R.J., both came to help. While J.C., his mother, and R.J. were trying to unlock the car, a car slowly passed by. A few minutes later, the same car again approached them. A passenger in that car fired several shots at J.C., his mother, and R.J., killing R.J.

In the course of the police's investigation of the killing, a witness identified defendant as the shooter. The People charged defendant with numerous offenses. A jury found defendant guilty of the charges identified above. The court sentenced defendant to life plus 150 years in the custody of the Department of Corrections.

## II. Discussion

Defendant contends that the district court erred in: (1) denying his motion to suppress; (2) denying the prosecution's motion to disqualify one of his trial attorneys; (3) denying his challenge for cause of a prospective juror; (4) allowing his attorney only sixty minutes to conduct voir dire; (5) allowing the prosecution to use his nickname; and (6) admitting certain evidence. We address and reject each of these contentions in turn, and also reject defendant's claim of cumulative error.

### A. Motion to Suppress

When the police learned that defendant was the shooter, they obtained a warrant for his arrest on a charge of first degree murder. In the midst of the process of obtaining the

John W. Suthers, Attorney General, Paul Koehler, First Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

The Law Office of Jonathan D. Rosen, PC, Jonathan D. Rosen, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge J. JONES.

Defendant, Ricardo Lemar Samuels, appeals the judgment of conviction entered on jury verdicts finding him guilty of one count of first degree murder (extreme indifference), two counts of attempted first degree

warrant, a police officer telephoned defendant's probation officer, told him about defendant's alleged involvement in the shooting, and said the police were going to arrest defendant that day. The probation officer said that he had an appointment to meet defendant that day. At the police officer's request, the probation officer telephoned defendant and told him that he would meet him at defendant's residence rather than at the probation officer's office. The probation officer accompanied police officers to defendant's residence, a group home. The police officers arrested defendant. On his own initiative, the probation officer then searched defendant's bedroom for evidence of probation violations; specifically, the probation officer suspected defendant of possessing a firearm because of the murder charge. The probation officer found two jackets linking defendant to the offense and, in a pocket of one of the jackets, a .40 caliber bullet cartridge wrapped in a tissue.

Defendant moved to suppress the jackets and bullet cartridge. Following a hearing, the district court denied the motion, finding that the probation officer had reasonable suspicion that defendant had violated conditions of his probation, a search of defendant's bedroom was therefore reasonable under the Fourth Amendment to the United States Constitution, and the scope of the search did not exceed that justified by the probation officer's reasonable suspicion that defendant had violated terms of his probation. The prosecution introduced the jackets and bullet cartridge into evidence at trial.

On appeal, defendant challenges the district court's suppression ruling on two bases. First, he contends the search was not permissible under the Fourth Amendment absent a warrant supported by probable cause because his mere status as a probationer did not, under the circumstances here, reduce his reasonable expectation of privacy in his residence. Second, he contends that even if the search was permissible without a warrant, the thorough search conducted by his probation officer of his bedroom and his belongings therein was not justified by the circumstances.

When reviewing a district court's ruling on a motion to suppress, we defer to the court's factual findings if supported by the record but review its legal conclusions, including any determination as to the defendant's reasonable expectation of privacy, de novo. *People v. Galvadon,* 103 P.3d 923, 927 (Colo.2005); *People v. Schall,* 59 P.3d 848, 851 (Colo.2002).

### 1. A search of defendant's bedroom was reasonable under the Fourth Amendment

It is undisputed that Colorado's statutes governing probation do not expressly state that warrantless searches of probationers' residences are permissible, nor is there any regulation so providing. It is also undisputed that although defendant was subject to several express conditions of probation, there was no express condition that he permit warrantless searches of his residence. The United States Supreme Court has yet to decide whether a warrantless search of a probationer's residence based on reasonable suspicion of a probation violation is consistent with the Fourth Amendment in the absence of such an authorizing law or condition. That issue is squarely before us in this case.

#### a. Law

■ The Fourth Amendment protects persons and, as relevant here, their residences "against unreasonable searches and seizures," and prohibits the issuance of warrants absent probable cause. U.S. Const. amend. IV. A search, therefore, usually may be undertaken only pursuant to a warrant supported by probable cause; however, exceptions exist when " 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.' " *Griffin v. Wisconsin,* 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987) (quoting in part *New Jersey v. T.L.O.,* 469 U.S. 325, 351, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (Blackman, J., concurring)); *accord People v. McCullough,* 6 P.3d 774, 779 (Colo.2000).

■ Whether a search is consistent with the Fourth Amendment turns on whether it is reasonable, "and the reasonableness of a search is determined 'by assessing, on the

one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *United States v. Knights,* 534 U.S. 112, 118–19, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) (quoting in part *Wyoming v. Houghton,* 526 U.S. 295, 300, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999)); *accord Samson v. California,* 547 U.S. 843, 848, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006); *see also Knights,* 534 U.S. at 121, 122 S.Ct. 587 ("[A] lesser degree [of cause] satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable."). We consider "'the totality of the circumstances'" weighing on either side of the balance. *Knights,* 534 U.S. at 118, 122 S.Ct. 587 (quoting *Ohio v. Robinette,* 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996)); *accord Samson,* 547 U.S. at 848, 126 S.Ct. 2193; *McCullough,* 6 P.3d at 779.

In three cases, *Griffin, Knights,* and *Samson,* the Supreme Court has examined the reasonableness of searches in circumstances similar, but not identical, to those here. The analysis employed by the Court in those cases significantly informs our analysis in this case, and therefore we briefly review the circumstances and holdings of each.

In *Griffin,* the Court reviewed a decision of the Wisconsin Supreme Court holding that probationers categorically have a reduced expectation of privacy, and therefore law enforcement officials may search a probationer's home without a warrant, based merely on "reasonable grounds" to believe evidence of a probation violation will be found. *State v. Griffin,* 131 Wis.2d 41, 388 N.W.2d 535, 541–42 (1986), *aff'd on other grounds,* 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). The Court concluded it did not need to decide whether the Wisconsin Supreme Court's conclusion was correct because it could affirm the denial of the motion to suppress on the ground the search "was carried out pursuant to a regulation that itself satisfie[d] the Fourth Amendment's reasonableness requirement under well-established principles." 483 U.S. at 872–73, 107 S.Ct. 3164. That regulation (adopted after the defendant was placed on probation, *see*

*Knights,* 534 U.S. at 117 n. 2, 122 S.Ct. 587; *Griffin,* 483 U.S. at 870–71, 107 S.Ct. 3164) allowed any probation officer to search a probationer's home without a warrant as long as there were "reasonable grounds" to believe it contained contraband the probationer was not permitted to possess. *Griffin,* 483 U.S. at 870–71, 107 S.Ct. 3164.

The Court reasoned that the operation of a probation system presents "special needs" beyond ordinary law enforcement justifying a departure from the usual warrant and probable cause requirements. *Id.* at 873–74, 107 S.Ct. 3164. Specifically, the Court observed that probation is one point on a continuum of possible punishment, and probationers therefore enjoy only conditional liberty; probation is intended to serve as a genuine period of rehabilitation; probationers are more likely than ordinary citizens to violate the law; and, therefore, supervision is necessary to assure that restrictions on probationers' liberty are observed. *Id.* at 874–75, 880, 107 S.Ct. 3164. These special needs rendered the warrant requirement impracticable and justified Wisconsin's adoption of a "reasonable grounds" standard: the warrant requirement would unjustifiably substitute a magistrate for the probation officer as the judge of how closely a probationer should be supervised, make it more difficult for supervisors to respond quickly to evidence of probation violations, and reduce the deterrent effect of potentially expeditious searches. *Id.* at 876, 107 S.Ct. 3164.

In *Knights,* the Court again addressed probationers' Fourth Amendment rights in the home search context. Unlike the situation in *Griffin,* no law purported to authorize warrantless searches of probationers' homes, under any level of suspicion or cause. However, the defendant signed a probation order stating that he agreed to allow his residence to be searched at any time, without a warrant or reasonable cause. 534 U.S. at 114, 122 S.Ct. 587. The Court held that a warrantless search of the defendant's residence was justified because the police officer who conducted the search had "reasonable suspicion" that the defendant possessed explosives. In deciding the issue, the Court did not treat it as one of consent, but weighed

the competing interests, once again considering the nature of probation. The Court reasoned that the same probation-specific factors noted in *Griffin*, as well as the probation condition allowing searches, "significantly diminished [the defendant's] reasonable expectation of privacy." *Id.* at 119–21, 122 S.Ct. 587. And, it reasoned, considerations arising in the probation context allowed the state to "justifiably focus on probationers in a way that it does not on the ordinary citizen." *Id.* at 120–21, 122 S.Ct. 587.

In *Samson*, the Court held that where a statute requires a parolee to agree to warrantless searches, even absent any cause, as a condition of parole, a search of a parolee's home need not be supported by any cause or suspicion. 547 U.S. at 846–47, 126 S.Ct. 2193. The Court relied heavily on its earlier decision in *Knights*, noting for example that it had regarded both Knights's status as a probationer and the probation condition as "salient" factors in the balancing analysis. *Id.* at 848–49, 852, 126 S.Ct. 2193. It observed that parolees are subject to even greater restrictions on liberty than are probationers, and the government's interest in supervising parolees is "overwhelming." *Id.* at 850–53, 126 S.Ct. 2193. Therefore, the Court concluded parolees have an even more greatly diminished reasonable expectation of privacy than do probationers.

Colorado jurisprudence in this area is sparse. In *McCullough*, the Colorado Supreme Court held that a parole officer's warrantless search of a parolee's belongings in his residence did not violate the Fourth Amendment, and upheld a Colorado statute authorizing such searches even in the absence of "reasonable grounds." 6 P.3d at 781.[1] Of significance here, the court discussed a variety of considerations pertaining to parole as bearing on parolees' reasonable expectations of privacy and the state's legitimate interests. These considerations included those discussed by the Court in *Griffin* in relation to probationers, such as restrictions on liberty, the need to protect the community, the need for close supervision, and the deterrent effect of the prospect of surprise searches. *Id.* at 779–80.

In *People v. Anderson*, 189 Colo. 34, 536 P.2d 302 (1975), the Colorado Supreme Court upheld a warrantless search of a parolee's residence where the parole officer had "reasonable grounds to enter the apartment to determine whether it was [the parolee's] established residence." *Id.* at 37–38, 536 P.2d at 305. The court focused, as it later would in *McCullough*, on the parolee's diminished liberty interest and the government's countervailing interest in monitoring parolees.

Courts in other jurisdictions are divided more or less evenly on whether either an authorizing law or probation condition is necessary to allow a warrantless search of a probationer's residence based on reasonable suspicion. *Compare United States v. Carter*, 566 F.3d 970, 973–75 (11th Cir.2009) (warrantless search of the probationer's home based on reasonable suspicion was constitutionally permissible even in the absence of a statutory or regulatory provision or a condition of probation permitting such searches) (*cert. petition filed* July 24, 2009, No. 09–5474); *United States v. Keith*, 375 F.3d 346, 350–51 (5th Cir.) (same), *cert. denied*, 543 U.S. 950, 125 S.Ct. 367, 160 L.Ed.2d 268 (2004); *and Griffin*, 388 N.W.2d at 536, 539–42 (same; noting, but not relying on, an authorizing regulation), *with Jones v. State*, 282 Ga. 784, 653 S.E.2d 456, 458–59 (2007) (warrantless search of the probationer's home was not constitutionally permissible in the absence of "a valid law, legally authorized regulation, or sentencing order giving notice of" the deprivation of rights); *Commonwealth v. Pickron*, 535 Pa. 241, 634 A.2d 1093, 1097–98 (1993) (same); *and State v. Howell*, No. M2007–00987–CCA–R3–CD, 2008 WL 732128, at *5–8 (Tenn.Crim.App. Mar.18, 2008) (unpublished) (same).

Courts in other jurisdictions have also addressed the constitutionality of searches under facts closely analogous to those here,

---

1. Although the court held that such a search must be conducted in furtherance of the purposes of parole, that requirement was subsequently rejected by the United States Supreme Court in *Knights*. *See Knights*, 534 U.S. at 116–18, 122 S.Ct. 587. The Colorado Supreme Court's ultimate holding, however, was consistent with the United States Supreme Court's later decision in *Samson*.

again with differing results. *See United States v. Yuknavich*, 419 F.3d 1302, 1304–05, 1308–11 (11th Cir.2005) (search of the probationer's computer in his home based on reasonable suspicion was constitutionally permissible even in the absence of an authorizing law or condition of probation); *People v. Johns*, 342 Ill.App.3d 297, 277 Ill.Dec. 66, 795 N.E.2d 433, 435–39 (2003) (warrantless search of the probationer's home violated the Fourth Amendment where, although probation order conditioned probation on agreement to submit to warrantless searches, law enforcement officers did not have even reasonable suspicion supporting the search); *State v. Bennett*, 288 Kan. 86, 200 P.3d 455, 457, 459–63 (2009) (condition of the probationer's probation requiring him to consent to warrantless, suspicionless searches violated the Fourth Amendment); *State v. Smith*, 589 N.W.2d 546, 548–50 (N.D.1999) (where statute and corresponding condition of probation authorized warrantless searches of the probationer's home, search was permissible even in the absence of reasonable suspicion); *State v. Lampman*, 45 Wash.App. 228, 724 P.2d 1092, 1095 (1986) (warrantless search of the probationer was permissible where it was based on reasonable suspicion of a probation violation).

Those courts holding that an authorizing law or probation condition is necessary to uphold a warrantless search based on reasonable suspicion have read *Griffin* and *Knights* as treating such factors as determinative— that is, absent one or the other, a probationer's reasonable expectation of privacy is not diminished sufficiently to render a warrantless search reasonable. *See Jones*, 282 Ga. at 787, 653 S.E.2d at 458–59 (considering *Griffin* and *Knights* ); *Pickron*, 634 A.2d at 1097–98 (considering *Griffin* ); *Howell*, 2008 WL 732128, at *5–8 (considering *Knights). Those courts holding to the contrary, however, have not read *Griffin* or *Knights* as treating the presence or absence of an authorizing law or condition of probation as determinative. They generally have viewed that circumstance as relevant, but have nevertheless concluded that the totality of the circumstances rendered the searches at issue rea-

sonable. *See Carter*, 566 F.3d at 973–75; *Keith*, 375 F.3d at 348–50.

We likewise do not read *Griffin* and *Knights* as imposing a categorical requirement of an authorizing law or probation condition to justify a warrantless search of a probationer's home based on reasonable suspicion. In both cases, as noted, the Court looked to the totality of the circumstances. Had the single factor of an authorizing law, as in *Griffin*, or a probation condition, as in *Knights*, been determinative, the Court's extended discussions of other factors weighing on both sides of the balance would appear to have been unnecessary.

Further, in *Knights*, the Court expressly regarded the probation condition as "salient." *See Samson*, 547 U.S. at 852, 126 S.Ct. 2193; *Knights*, 534 U.S. at 118, 122 S.Ct. 587. It is one thing to treat a fact as salient, that is, relevant; it is another, however, to treat it as dispositive.

In *Griffin*, the Court relied, in part, on the authorizing law expressly to avoid deciding the question now before us. Relying on that fact made the results more certain, enabling the Court to decide the case on the narrowest possible grounds. It does not necessarily follow from the reasoning of *Griffin*, therefore, that the presence of the authorizing law was essential.

We also observe that in *Griffin*, the authorizing law (a regulation) was not adopted until *after* the defendant had been sentenced to probation. *See Knights*, 534 U.S. at 117 & n. 2, 122 S.Ct. 587; *Griffin*, 483 U.S. at 870–71 & n. 1, 107 S.Ct. 3164. The defendant therefore had no knowledge of or opportunity to object to the regulation at the time of sentencing. As one commentator has pointed out, under that circumstance, "it cannot be seriously argued that the notice [given by the regulation] was in any sense meaningful." Stewart D. Bratcher, *Requiring Notice: Georgia Probationers' Fourth Amendment Rights After Jones v. State*, 1 J. Marshall L.J. 153, 166–67 (2008).

Finally, we are mindful of the Supreme Court's admonition in *Knights* that courts not employ the "dubious logic" that "an opinion upholding the constitutionality of a par-

ticular search implicitly holds unconstitutional any search that is not like it. . . ." *Knights,* 534 U.S. at 117, 122 S.Ct. 587. The Court chastised the appellate court for essentially employing such reasoning in concluding that an authorizing law such as that present in *Griffin* was necessary to render constitutional a warrantless search of a probationer's home.

■ We agree with the Fifth Circuit Court of Appeals that "[t] he core reasoning of the Court in both [*Griffin* and *Knights* ] is directed at explaining why the needs of the probation system outweigh the privacy rights of the probationers generally, who inherently 'do not enjoy the absolute liberty to which every citizen is entitled.' " *Keith,* 375 F.3d at 350 (quoting in part *Knights,* 534 U.S. at 119, 122 S.Ct. 587). Therefore, we conclude that Supreme Court precedent does not dictate that the absence of an authorizing law or condition of probation necessarily renders unconstitutional a warrantless search of a probationer's residence based on reasonable suspicion. The totality of all other relevant circumstances may render such a search reasonable. Accordingly, we turn to an assessment of those circumstances in this case.

#### b. Application

##### i. Defendant's reasonable expectation of privacy

■ We begin by acknowledging that probationers have a reasonable expectation of privacy in their homes. *Griffin,* 483 U.S. at 873, 107 S.Ct. 3164; *see also Kyllo v. United States,* 533 U.S. 27, 34, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (the home is the "prototypical . . . area of protected privacy"). However, probationers, merely by virtue of their probationary status, have a significantly diminished reasonable expectation of privacy. *See Knights,* 534 U.S. at 119, 122 S.Ct. 587. A probationer's liberty is conditional—that is, it is restricted, though not ordinarily to the extent that a parolee's liberty is restricted. *Samson,* 547 U.S. at 850, 126 S.Ct. 2193; *Knights,* 534 U.S. at 119, 122 S.Ct. 587; *McCullough,* 6 P.3d at 779 n. 10.

In Colorado, probationers are closely supervised. *See* §§ 16–11–209, 18–1.3–204, C.R.S.2009. Probation officers directly supervise probationers. These probation officers are "peace officers" under Colorado law and therefore are authorized to enforce all state laws while acting within the scope of their authority. §§ 16–2.5–101(1), –137, 16–11–209, C.R.S.2009.

By statute, the sentencing court may impose a host of conditions on probationers curtailing their liberty. In this case, the court imposed several such conditions. Defendant's probation officer explained each of them to defendant and defendant acknowledged each one in writing. As relevant here, the standard conditions included the following:

- defendant was not to violate any local, state, or federal law;
- he was to maintain a permanent address and notify his probation officer of any change in his permanent address;
- he could not leave Colorado without the permission of the court or his probationer officer;
- he was required to permit his probation officer to visit him at his home or elsewhere at reasonable times;
- he was required to answer all reasonable inquiries by his probation officer;
- he could not possess any firearm, explosive, or other destructive device, or any dangerous weapon;
- he could not use alcohol or controlled substances; and
- he was required to comply with any other condition imposed by his probation officer.

Defendant's liberty was further curtailed because the court placed him on "intensive supervised probation" (ISP), a status reserved for those offenders deemed to present the greatest risk to the community. ISP programs are formulated to "protect the safety and welfare of the public in the community" and to provide "the highest level of supervision that is provided to probationers." § 18–1.3–208(1), (3), C.R.S.2009. Therefore, in addition to standard conditions of probation, the court imposed the following relevant conditions on defendant:

- he could not leave the Denver metropolitan area without his probation officer's permission;

- he was required to respond to all reasonable requests by his probation officer;

- he was required to meet with his probation officer weekly;

- he was required to telephone his probation officer daily;

- he was required to remain at his residence from 9:00 p.m. to 5:00 a.m. everyday; and

- he was required to submit to drug and alcohol testing.

Further, although there is no statute or regulation in Colorado authorizing warrantless searches of probationers' homes based on reasonable grounds, in 1994 the State Court Administrator issued a memorandum to all probation departments throughout Colorado stating that probation officers may conduct such searches, and citing as authority therefor *Griffin* and *Anderson*. That memorandum (which was introduced into evidence at the suppression hearing) also places limits on searches and establishes procedures for conducting them. *Cf. Pickron*, 634 A.2d at 1098 (holding search unconstitutional, in part because of the absence of any procedural guidelines limiting the discretion of individual parole officers). Defendant's probation officer testified at the suppression hearing that he acted pursuant to that memorandum in this case. Though that memorandum does not have the force of law, it reflects the policy judgment of the agency responsible for overseeing the probation system, much as did the regulation at issue in *Griffin*, and longstanding practice in Colorado. *Cf. Keith*, 375 F.3d at 350 (because Louisiana courts had consistently sustained searches of probationers' homes based on reasonable suspicion of probation violations, probationers were just as aware of the diminished expectation of privacy that follows from probation as probationers in states with *Griffin*-like regulations).

We therefore conclude that defendant's reasonable expectation of privacy in his residence was greatly reduced.

ii. The state's interests

Weighing on the other side of the balance are substantial state interests. As noted by the Supreme Court, " 'the very assumption of the institution of probation' is that the probationer 'is more likely than the ordinary citizen to violate the law.' " *Knights*, 534 U.S. at 120, 122 S.Ct. 587 (quoting in part *Griffin*, 483 U.S. at 880, 107 S.Ct. 3164). And here, this assumption has added force given defendant's status as a probationer on ISP.

In addition, the state has a substantial interest in reintegrating probationers into the community, one best served if probation officers have leeway in assessing when a search is justified. *See id.* at 120–21, 122 S.Ct. 587; *Griffin*, 483 U.S. at 875, 107 S.Ct. 3164 (state's twin goals of rehabilitation and protecting the community "justify the exercise of supervision to assure that the restrictions [on a probationer's conduct] are in fact observed"). And, as the facts of the present case illustrate, imposing a warrant or probable cause requirement would "make it more difficult for probation officials to respond quickly to evidence of misconduct, ... and would reduce the deterrent effect that the possibility of expeditious searches would otherwise create...." *Griffin*, 483 U.S at 876, 107 S.Ct. 3164 (citation omitted).

We also find relevant the fact the search here was for evidence of defendant's use of a firearm, a circumstance in which the state's interest in quick detection is particularly strong. *Id.* at 879, 107 S.Ct. 3164 ("In some cases—especially those involving drugs or illegal weapons—the probation agency must be able to act based upon a lesser degree of certainty than the Fourth Amendment would otherwise require...."); *Carter*, 566 F.3d at 974–75 (noting the government's "high interest in preventing ... violence-related crimes"). Along the same lines, we consider the fact defendant had three prior felony convictions when he was placed on ISP. *See Carter*, 566 F.3d at 975 (stating that the government may have a higher interest in monitoring a particular probationer due to the nature of his criminal history).

### iii. Conclusion

■ Taking into consideration all these circumstances, we conclude that the balance tips in favor of concluding that the search here was reasonable. The probation officer's reasonable suspicion that defendant had violated conditions of his probation was sufficient to justify the search of defendant's bedroom: neither a warrant nor probable cause was required.

■ Though defendant does not challenge the district court's finding that the probation officer had such reasonable suspicion of probation violations, he appears to contend there was no reason to believe evidence of probation violations would be found in his bedroom. He did not raise this contention below, however, and therefore we need not address it. *See People v. Gouker*, 665 P.2d 113, 117–18 (Colo.1983) (a defendant may not raise a new challenge to an arrest warrant on appeal after challenges in the district court proved unsuccessful); *People v. Salyer*, 80 P.3d 831, 835 (Colo.App.2003) (a defendant may not urge grounds for suppression of evidence on appeal that he did not raise in the district court). Nonetheless, we think it reasonable to believe that evidence linking defendant to possession of a firearm or other violation of law might be found in the only place over which defendant had virtually exclusive control and in which he resided.

Therefore, we conclude that a search, of some scope, of defendant's bedroom did not violate the Fourth Amendment.

### 2. The probation officer did not exceed the permissible scope of the search

■ Defendant also contends that even if a warrant was not required, the probation officer exceeded the permissible scope of the search because he searched places and items not large enough to contain a weapon.

The People argue defendant did not adequately raise this claim in the district court, and therefore may not raise it on appeal. Defendant responds that he adequately raised the issue by stating in his written motion to suppress: "Furthermore, the scope and character of the search was [sic] not reasonably related to its purpose. *People v.*

*Altman*, 938 P.2d 142 (Colo.1997)." We agree with the People.

At the suppression hearing, defendant did not pursue the cryptic contention in his motion by way of presenting either evidence or argument. A conclusory, boilerplate contention in a motion to suppress is insufficient, by itself, to preserve an issue for appeal. *People v. Mendoza*, 82 N.Y.2d 415, 604 N.Y.S.2d 922, 624 N.E.2d 1017, 1018–26 (1993); *Handy v. State*, 189 S.W.3d 296, 298 (Tex.Crim.App. 2006); *see also Gouker*, 665 P.2d at 117–18; *Salyer*, 80 P.3d at 835; *cf. United States v. Moran–Garcia*, 783 F.Supp. 1266, 1274 (S.D.Cal.1991) (boilerplate motion to suppress containing only indefinite and conjectural assertions did not warrant a hearing); *State v. Boone*, 108 Ohio App.3d 233, 670 N.E.2d 527, 531 (1995) (same).

In any event, we conclude the probation officer's search did not exceed its permissible scope. The question here is not whether each item searched was large enough to contain a firearm, but rather whether the items searched were capable of concealing evidence that defendant had possessed a firearm. The jacket pockets and the tissue found in one of them were. *Cf. People in Interest of D.F.L.*, 931 P.2d 448, 451–52 (Colo.1997) (search pursuant to a valid warrant may include containers which could contain the contraband or evidence sought).

### B. Right to Conflict–Free Counsel

■ Defendant contends that one of his trial attorneys, J.W., had a conflict of interest, and that because he did not knowingly and intelligently waive his right to conflict-free counsel, the district court violated his constitutional right to effective assistance of counsel by refusing to disqualify his attorney on the prosecution's motion. We are not persuaded.

The prosecution filed a motion requesting that the district court determine whether J.W. had a conflict of interest because he had represented G.S., a prosecution witness, in two other unrelated cases. In a written response, J.W. stated that he had previously represented G.S. in two other unrelated criminal cases involving charges of aggravat-

ed robbery and providing false information to a pawnbroker, that he had represented G.S. before G.S. became a witness in defendant's case, and that he had withdrawn as G.S.'s counsel before G.S. discussed testifying against defendant with law enforcement officers. About one month after J.W. had withdrawn from representing G.S., he learned that G.S. would likely be a witness against defendant. He also stated that he did "not believe he obtained any confidential information from [G.S.] that is relevant to the defense of [defendant]," that he had disclosed these facts to and discussed the matter with defendant, and that defendant wanted to waive any perceived, potential, or actual conflict and retain J.W. as his counsel.

The prosecution subsequently requested that the court disqualify J.W. The court conducted a hearing at which J.W. essentially reiterated what he had said in his written response. J.W. also informed the court that his file pertaining to G.S. had been closed and sealed by the Public Defender's Office, neither he nor any other public defender had access to that file, and co-counsel (also a public defender), with whom he had not discussed G.S., would cross-examine G.S. if G.S. testified at defendant's trial. When J.W. stated that defendant had agreed to waive any potential conflict, defendant nodded his head. The prosecutor acknowledged that G.S.'s plea agreement with the People in other unrelated cases was reached "prior to [the] witness coming forward with any information on any cases," and, even more specifically, that G.S.'s plea agreement did not relate to any testimony he might give in this case.

After hearing argument on the motion, the district court, focusing on Colo. RPC 1.9 (which governs an attorney's duties to former clients), found that J.W. did not have a conflict of interest because G.S.'s and defendant's cases were not substantially related. The court also found that no plea bargaining relating to this case occurred while J.W. represented G.S. and that J.W. did not obtain any confidential information from G.S. relevant to defendant's defense.

G.S. testified at trial for the People. J.W.'s co-counsel made objections to the prosecutor's questions of G.S. and cross-examined G.S.

On appeal, defendant contends the district court violated his right to effective assistance of counsel by applying Rule 1.9 rather than Colo. RPC 1.7(a) (which governs conflicts of interest as to current clients) in determining whether a conflict existed, and that J.W. had a conflict under Rule 1.7(a) which defendant did not waive.[2]

The People respond initially that defendant cannot raise this argument on appeal because the district court adopted the position taken by his trial counsel—that Rule 1.9 applied. Essentially, the People argue that defendant is barred from raising this issue on appeal by the doctrine of invited error. However, if defendant's trial counsel had a conflict of interest, he could not bind defendant to any position on this issue. Therefore, the doctrine of invited error does not apply here, and we will consider defendant's argument.

At the outset, we note that although defendant now claims his constitutional right to effective assistance of counsel was violated, no such claim was asserted in the district court. The People's motion to disqualify J.W. was premised on *People ex rel. Peters v. District Court*, 951 P.2d 926 (Colo.1998), a case addressing disqualification under the Rules of Professional Conduct.

Because no constitutional claim was raised in the district court, we review that claim for plain error. *See People v. Rogers*, 68 P.3d 486, 492 (Colo.App.2002) (where the defendant did not object to evidence or the prosecutor's comments regarding his invocation of his right to counsel on constitutional grounds at trial, his contention on appeal that his right to counsel was abridged would be reviewed for plain error). Plain error is error that is both obvious and substantial, and which so undermines the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction. *People v. Miller*, 113 P.3d 743, 750 (Colo.

**2.** Defendant does not alternatively challenge the district court's ruling under Rule 1.9.

2005); *People v. Jimenez*, 217 P.3d 841, 869 (Colo.App.2008).

■■■ "The Sixth Amendment's guarantee of effective assistance of counsel encompasses a defendant's right to conflict-free counsel." *People v. Shari*, 204 P.3d 453, 457 (Colo.2009). This right "can therefore be violated by 'representation that is intrinsically improper due to a conflict of interest.'" *Dunlap v. People*, 173 P.3d 1054, 1070 (Colo. 2007) (quoting in part *People v. Castro*, 657 P.2d 932, 943 (Colo.1983)).

> A conflict of interest can arise where a defense attorney previously represented a prosecution witness because of the duty of confidentiality that survives the termination of an attorney-client relationship.... This duty creates the possibility that the attorney will be hindered in cross-examining the witness, which thus impedes the attorney's ability to zealously represent the current client.

*Id.* at 1070 (citation omitted).

As noted, defendant claims a denial of his Sixth Amendment right to effective assistance of counsel solely by virtue of a conflict under Colo. RPC 1.7.[3] However, a conflict of interest under the Rules of Professional Conduct does not necessarily equate to a violation of the Sixth Amendment right to effective assistance of counsel. *See Mickens v. Taylor*, 535 U.S. 162, 174, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002) (to prevail on a claim of a deprivation of the Sixth Amendment right to effective assistance of counsel, the defendant must show "that the conflict of interest adversely affected his counsel's performance"); *Nix v. Whiteside*, 475 U.S. 157, 165, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986) ("[A] court must be careful not to narrow the wide range of conduct acceptable under the Sixth Amendment so restrictively as to constitutionalize particular standards of professional conduct."). Nonetheless, we need not explore the extent of any relationship between Rule 1.7(a) and the Sixth Amendment because we

conclude there was no conflict under Rule 1.7(a).

As relevant here, Rule 1.7(a) provides:

> Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
>
> . . .
>
> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

Defendant equates J.W.'s alleged conflict with that of the attorney at issue in *People ex rel. Peters*. In that case, the attorney represented a prosecution witness in plea bargaining, which culminated in the witness agreeing to testify against the defendant. The attorney continued to represent the witness while other attorneys in his firm represented the defendant. 951 P.2d at 928, 931–32. The court held that the attorney's firm's representation of the defendant was adverse to the witness's interests because the attorneys representing the defendant would be required to discredit the witness's truthfulness. *Id.* at 932. The firm's representation of the defendant was thus prohibited by Rule 1.7(a) and Colo. RPC 1.10(a) (imputed disqualification). *Id.*[4]

The facts here are distinguishable from those in *People ex rel. Peters*. J.W. withdrew as G.S.'s counsel before G.S.'s plea negotiations concerning defendant. Moreover, defendant points to nothing in the record casting doubt on the court's finding that J.W. did not obtain any confidential information from G.S. that was relevant to defendant's defense.

Defendant's reliance on *Rodriguez v. District Court*, 719 P.2d 699 (Colo.1986), is also misplaced. In *Rodriguez*, the defendant was

---

3. Though defendant cites article II, section 16 of the Colorado Constitution, he has not presented any separate argument or analysis predicated on that provision. Therefore, we address only the claim under the Sixth Amendment. *See People v. Olson*, 921 P.2d 51, 56 (Colo.App.1996).

4. The rule of imputed disqualification in Rule 1.10(a) does not automatically apply to government attorneys such as those employed by the Public Defender's Office. *Shari*, 204 P.3d at 459 & n. 7.

represented by one public defender while another public defender represented a witness on unrelated charges. *Id.* at 700. The witness contacted the district attorney's office and met with prosecutors to discuss documents the witness possessed that tended to incriminate the defendant. *Id.* at 700–01. The witness's public defender was not present at any of the meetings, but subsequently met with the witness and expressed disapproval of her dealings with the district attorney's office and became angry with her. *Id.* at 701. The next day, the witness delivered the documents to the prosecution, and her public defender withdrew from representing her. *Id.* The court held that the attorney had a conflict of interest because he had obtained confidential information from the witness that may have been unavailable to the prosecution, the public defender's cross-examination of the witness could have been restricted by duties to the witness, or the public defender could have been tempted to use information disclosed in confidence by the witness to impeach her. *Id.* at 704. Therefore, the court concluded that the witness's public defender had a conflict of interest in maintaining privileged communications received from the witness—a conflict that was imputed to the defendant's public defender. *Id.*

Here, again, J.W. withdrew from representing G.S. prior to G.S.'s negotiations with law enforcement concerning defendant. Therefore, unlike the public defender in *Rodriguez*, J.W. did not have any knowledge of the interplay between the witness and law enforcement regarding the witness's testimony. And, unlike the public defender in *Rodriguez*, J.W. did not obtain confidential information from G.S. that might have been useful in cross-examining him.

In sum, we conclude that J.W.'s previous representation of G.S. did not create a conflict of interest with defendant. It follows that the district court did not err in refusing to disqualify J.W. under the Rules of Professional Conduct.

## C. Biased Juror

■ Defendant contends the district court erroneously denied his challenge for cause with respect to a prospective juror, D.V. We conclude that the district court did not abuse its discretion.

The People argue that because defendant did not exhaust his peremptory challenges, he did not preserve this contention for appeal. The cases the People cite for the exhaustion rule, however, have not yet extended the rule's application to cases in which the challenged prospective juror served on the jury. *Dunlap*, 173 P.3d at 1081–82; *Ma v. People*, 121 P.3d 205, 209–10 (Colo.2005); *People v. Harlan*, 8 P.3d 448, 459–60 (Colo. 2000); *see also People v. Macrander*, 828 P.2d 234 (Colo.1992). The Colorado Supreme Court has expressly declined to decide whether the rule applies when a challenged prospective juror serves on the jury, recognizing that whether a defendant was deprived of his right to a fair trial because a biased juror served on his jury is a different question from whether the defendant's right to the full use of peremptory challenges was violated. *Dunlap*, 173 P.3d at 1082; *see also Morrison v. People*, 19 P.3d 668, 670–71 & n. 2 (Colo.2000).

There is substantial authority for applying the exhaustion rule where the challenged prospective juror serves on the jury. *See, e.g., United States v. Martinez–Salazar*, 528 U.S. 304, 318, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000) (Scalia, J., joined by Kennedy, J., concurring); *Merritt v. Evansville–Vanderburgh School Corp.*, 765 N.E.2d 1232, 1235–37 (Ind. 2002). We need not resolve this question, however, because even if we assume that defendant was not required to exhaust his peremptory challenges, he is not entitled to relief.

During voir dire, defendant's counsel told prospective jurors that defendant had been convicted of a felony and was on felony probation at the time of the shooting. He asked the prospective jurors whether any of them would believe that defendant was more likely to be violent because he is a felon. D.V. stated that she thought defendant's status was something she would "take into account" and that defendant would be more likely than others in the "general population" to have committed the murder because he was a felon. When defendant's counsel questioned

her further, she again stated that defendant's status was "another piece of information" she would consider along with the other evidence presented.

Later in voir dire, the court explained a number of concepts and governing principles to the prospective jurors, including that if defendant testified, and his prior felony conviction was disclosed, they could consider it as bearing only on his credibility, and not for the purpose of determining whether he committed the charged offenses. D.V. stated that she could adhere to that limitation.

Defendant's counsel challenged D.V. for cause based on her answers to questions about defendant's status as a felon. The district court denied the challenge.

■ A criminal defendant has a fundamental constitutional right to a fair and impartial jury. *Dunlap*, 173 P.3d at 1081 (citing *Morgan v. Illinois*, 504 U.S. 719, 726–27, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992)); *Morrison*, 19 P.3d at 673. To protect this right, a court " 'must grant a challenge for cause if a prospective juror is unwilling or unable to accept the basic principles of criminal law and to render a fair and impartial verdict based upon the evidence admitted at trial and the court's instructions.' " *Dunlap*, 173 P.3d at 1081 (quoting *Harlan*, 8 P.3d at 460); *see also* § 16–10–103(1)(j), C.R.S.2009 (requiring a court to sustain a challenge for cause to a prospective juror with a state of mind evincing enmity or bias against the defendant); *Morrison*, 19 P.3d at 671; *Carrillo v. People*, 974 P.2d 478, 486 (Colo.1999).

■ When a defendant challenges a juror for cause on the basis of actual bias, the defendant bears the burden of " 'demonstrat[ing], through questioning, that the potential juror lack[s] impartiality.' " *People v. Rodriguez*, 914 P.2d 230, 263 (Colo.1996) (quoting *Wainwright v. Witt*, 469 U.S. 412, 423, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)).

The district court has broad discretion in ruling on a challenge for cause, and therefore we will overturn such a ruling only upon a showing that the district court abused that discretion. *Dunlap*, 173 P.3d at 1082; *Carrillo*, 974 P.2d at 485. "This high standard of review is justified because such determina-

tions often turn on assessments of the potential juror's demeanor, credibility, and sincerity. . . . The trial court is in a unique position to assess these qualities." *Dunlap*, 173 P.3d at 1082 (citation omitted); *accord Carrillo*, 974 P.2d at 486. We must review the entire voir dire to determine whether the district court abused its discretion. *Carrillo*, 974 P.2d at 486.

We have reviewed the record of the entire voir dire of D.V. Though D.V. initially indicated a tendency to misuse evidence that defendant had previously been convicted of a felony, after the court explained the limits on how such evidence may be used she unequivocally stated that she could follow that instruction. Further, earlier in voir dire D.V. had stated that she could make an impartial decision based on the evidence and that she could follow the law as explained to her by the court, and had indicated that the fact the case involved a drive-by shooting with gang-related overtones would not affect her ability to be fair and impartial. We therefore conclude that the district court did not abuse its discretion in denying defendant's challenge of D.V. *Cf. People v. Vecchiarelli–McLaughlin*, 984 P.2d 72, 76 (Colo.1999) ("Although the prospective juror . . . may have displayed a preconceived opinion that defendants in general should testify in their own defense, he later confirmed that he would not use the defendant's decision not to testify as evidence of his guilt.").

D. Limitation on the Length of Voir Dire

■ Defendant also contends that the district court deprived him of his fundamental right to a fair and impartial jury by limiting his counsel's voir dire to sixty minutes, rather than allowing the ninety minutes he requested. We are not persuaded.

The court rejected the parties' respective requests for ninety minutes to conduct voir dire, concluding that in light of the prospective jurors' completion of an extensive questionnaire, sixty minutes per side should be sufficient. We review this decision for an abuse of discretion. *People v. Reaud*, 821 P.2d 870, 871 (Colo.App.1991) ("[A] restriction upon [the length of] voir dire examination by counsel will be considered to be re-

versible error only if the court abuses its discretion with a prejudicial result.").

■ "The purpose of voir dire is to determine whether a potential juror has beliefs that would interfere with a defendant's right to receive a fair and impartial trial." *People v. Rudnick,* 878 P.2d 16, 20–21 (Colo.App. 1993). However, the right to an impartial jury does not require that defense counsel be granted unlimited voir dire. *People v. O'Neill,* 803 P.2d 164, 169 (Colo.1990). In the interest of judicial economy, the district court "may reasonably limit the time available to the parties or their counsel for juror examination." Crim. P. 24(a)(3).

We perceive no abuse of discretion here. Voir dire lasted approximately six hours. As noted, the prospective jurors completed detailed questionnaires in advance of voir dire (in addition to answering the standard questions set forth on the jury summons). Defendant has not established that there was anything about the issues in the case which rendered sixty minutes per side inadequate to determine whether the potential jurors could fairly resolve them. *Cf. Rudnick,* 878 P.2d at 21 (no abuse of discretion in limiting voir dire to ninety minutes per side where time allotted did not include in camera discussions with prospective jurors or the court's extensive voir dire); *People v. Heller,* 698 P.2d 1357, 1361 (Colo.App.1984) (limiting defendants to a total of one hour of voir dire not unreasonable where entire voir dire process consumed six hours), *rev'd on other grounds,* 712 P.2d 1023 (Colo.1986).

### E. Prosecutor's Repeated References to Defendant's Nickname

■ Defendant contends that the prosecutor's repeated references to his nickname, "Smoke," in conjunction with an exhibit showing him "flashing gang signs," prejudicially characterized him as a gang member. Again, we are not persuaded.

We review this contention for an abuse of discretion. *People v. Rojas,* 181 P.3d 1216, 1223 (Colo.App.2008); *People v. Valencia–Alvarez,* 101 P.3d 1112, 1117 (Colo.App.2004).

Before trial, defendant moved to prohibit any reference to his nickname. The district court found that because defendant was proud of the nickname, and many of the witnesses knew him solely by it, there was nothing "inherently derogatory" about its use. The court stated that it would monitor the use of the nickname at trial to determine if there were any improper inferences about gang activity that could be drawn therefrom.

Defendant did not object at trial to any of the prosecutor's uses of his nickname. Nonetheless, we will assume defendant preserved his claim of error.

Defendant's nickname was the name by which many witnesses knew him. Moreover, a detective testified that her investigation of the shooting was initially frustrated because witnesses could only provide her with defendant's nickname and not his real name. The nickname was therefore relevant to the issue of identification. *Cf. People v. DeHerrera,* 680 P.2d 848, 850 (Colo.1984) (use of an alias may be relevant to the issue of identification). Indeed, defendant concedes that "factual witnesses may have known [him] as 'Smoke' and may have properly referred to him as such...." The prosecutor did not refer to defendant's nickname in an effort to convince the jury that defendant was a gang member. To the contrary, the prosecutor told the jury defendant was not a gang member. The prosecutor's references to defendant's nickname appear to have been intended to drive home the point that defendant was the person witnesses knew as "Smoke." And those witnesses had information that "Smoke" was the shooter. Therefore, the district court did not abuse its discretion in allowing the prosecutor's references to defendant's nickname.

### F. Evidentiary Contentions

Defendant contends that the district court erred in allowing the prosecution to introduce the following evidence: (1) a photograph showing him "throwing gang signs"; (2) testimony by two witnesses that he had possessed a gun; and (3) testimony that he had threatened a witness. We conclude that the district court did not abuse its discretion in admitting this evidence.

### 1. Photograph

In the photograph at issue, defendant is seen standing next to two individuals (one of whom was a codefendant) in front of a night club. Defendant's counsel conceded at trial that the existence of the photograph was relevant to a detective's determination of defendant's identity, but objected under CRE 403 to the prosecution's introduction of the photograph into evidence as more prejudicial than probative because it showed defendant making "gang-type signs," and there was no evidence that defendant was a gang member.

The prosecutor responded that the photograph was relevant: (1) to establish defendant's identity as the person various witnesses knew as "Smoke"; (2) because it showed defendant with his codefendant; and (3) because it connected defendant to a jacket that was later recovered from his bedroom and which tested positive for gunshot residue. Additionally, the prosecutor stated that he would not elicit testimony that the photograph showed defendant making gang signs. The district court overruled the objection.

Under CRE 403, relevant evidence should be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. We review a district court's ruling on a CRE 403 objection for an abuse of discretion. *People v. Gonzales–Quevedo*, 203 P.3d 609, 615 (Colo.App.2008); *People v. Ray*, 109 P.3d 996, 1001 (Colo.App.2004). In reviewing the district court's CRE 403 ruling, "we afford the evidence its maximum probative value and the minimum reasonable prejudicial effect." *Gonzales–Quevedo*, 203 P.3d at 615.

The photograph had substantial probative value as identification evidence and in linking defendant to the jacket. Though it arguably shows defendant making "gang-type signs," the prosecutor did not refer to those signs during direct examination of the detective through whom the photograph was offered into evidence, and later told the jury that the photograph did not show defendant making gang signs. We are therefore unwilling to infer any unfair prejudice from the photograph, much less any substantial unfair prejudice. Under these circumstances, the court's ruling admitting the photograph was not an abuse of discretion. *Cf. United States v. Smith*, 63 F.3d 956, 963 (10th Cir.1995) (no abuse of discretion where the court admitted a photograph of the defendant making gang signs for impeachment purposes and instructed the jury about the limited relevance of the photograph), *vacated on other grounds*, 516 U.S. 1105, 116 S.Ct. 900, 133 L.Ed.2d 834 (1996).

### 2. Witnesses' testimony that defendant possessed a gun

A witness testified, "[Defendant] had his heat with him all day every day.... Yeah, Smoke always had his heat on him. I'm saying no matter where you go, Smoke had his heat." The witness then identified the gun defendant carried as either a .40 caliber or a nine millimeter handgun.

Defendant's counsel objected to this testimony under both CRE 403 and CRE 404(b), arguing that the evidence had no probative value as to what occurred at the time of the shooting and created an impermissible inference of bad character. The prosecutor responded that the statement was highly relevant because the witness saw defendant with a gun in the weeks preceding the shooting and the type of gun the witness had seen defendant carry was consistent with other evidence showing the perpetrator shot the victim with a .40 caliber handgun. The district court overruled defense counsel's objection, concluding that the probative value of the testimony was not substantially outweighed by the danger of unfair prejudice and that the testimony was not evidence of another crime or act subject to CRE 404(b).

Another witness testified that he had seen defendant with guns and that defendant had a few guns "on stash-away." Defendant's counsel objected only on relevance grounds. The district court overruled the objection.

On appeal, defendant contends only that both witnesses' testimony was improper under CRE 404(b). We review this contention for an abuse of discretion. *See People v. Stewart*, 55 P.3d 107, 122 (Colo.2002); *People v. Romero*, 197 P.3d 302, 307 (Colo.App. 2008). And, because defendant did not object to the second witness's testimony under CRE

404(b), we further review his contention as to that witness's testimony for plain error. *Salyer,* 80 P.3d at 838–39; *People v. Thompson,* 950 P.2d 608, 613 (Colo.App.1997).

The witnesses' testimony was not evidence of other crimes, wrongs, or acts within the meaning of CRE 404(b). Their testimony did not suggest that defendant's past conduct in carrying a gun constituted a wrong or a bad act demonstrating a particular character trait. Rather, it circumstantially linked defendant to the shooting and, even more specifically in the case of the first witness's testimony, to the .40 caliber shell casings found at the scene of the shooting. Additionally, the People charged defendant with possession of a weapon by a previous offender. Testimony that defendant had possessed a handgun was therefore direct evidence supporting that charge as well. *Cf. United States v. Moorehead,* 57 F.3d 875, 878 (9th Cir.1995) (witnesses' statements that the defendant had possessed a gun on prior occasions was not character evidence but direct evidence of the crimes charged); *United States v. Elder,* 16 F.3d 733, 737 (7th Cir. 1994) (testimony that defendant possessed a shotgun on various dates did not constitute "other acts" under Fed.R.Evid. 404(b) because the evidence bore directly on the charge of possession on a specific date); *State v. Clark,* 62 Conn.App. 182, 774 A.2d 183, 189–94 (2001) (no abuse of discretion in allowing witness's testimony that approximately one week before shooting she saw the defendant in possession of a firearm similar to the one he had the night of the shooting), *aff'd,* 260 Conn. 813, 801 A.2d 718 (2002). We therefore conclude that the district court did not abuse its discretion in admitting the witnesses' testimony.

### 3. Threats against a witness

We also reject defendant's contention that the district court erred in allowing a witness to testify that defendant threatened to kill his codefendant if the codefendant talked to the police about the murder. Defendant did not object to that testimony, and so our review is for plain error. *People v. Beilke,* —— P.3d ——, —— (Colo.App. No. 07CA0137, June 25, 2009).

We perceive no error, plain or otherwise. It is well established that evidence of threats against a witness is relevant to show consciousness of guilt. *People v. Lowe,* 660 P.2d 1261, 1265 (Colo.1983), *abrogated in part on other grounds by Callis v. People,* 692 P.2d 1045 (Colo.1984); *People v. Kyle,* 111 P.3d 491, 499 (Colo.App.2004) ("[e]vidence of a defendant's behavior, including threats against witnesses or nonwitnesses, may be admissible to show that the defendant was conscious of guilt and, by further inference, committed the crime charged"); *People v. Eggert,* 923 P.2d 230, 234–35 (Colo. App.1995).

### G. Cumulative Error

Finally, because we have concluded that the district court did not err, we reject defendant's contention that cumulative error warrants reversal. *See People v. Whitman,* 205 P.3d 371, 387 (Colo.App.2007) ("The doctrine of cumulative error requires that numerous errors be committed, not merely alleged.").

The judgment is affirmed.

Judge RUSSEL and Judge TERRY concur.