IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No.   37411-4-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | ORDER WITHDRAWING |
| CHRISTOPHER ALMARAL, | ) | OPINION |
| | ) | |
| Appellant. | ) | |

THE COURT on its own motion finds that the opinion filed April 14, 2022, should be withdrawn:

THEREFORE, IT IS ORDERED, the opinion filed April 14, 2022, is hereby withdrawn and a new opinion will be filed this day.

PANEL: Judges Fearing, Siddoway, Lawrence-Berrey

FOR THE COURT:

_____
LAUREL H. SIDDOWAY
Chief Judge

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 37411-4-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| CHRISTOPHER ALMARAL, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Christopher Almaral appeals his convictions for possession of a controlled substance, possession of unlawful firearm, and first degree murder. He also challenges his community custody conditions. Pursuant to *State v. Blake*, we vacate his conviction for possession of a controlled substance. We vacate his guilty plea for possession of unlawful firearm because the record does not show that Almaral intelligently pled guilty to the crime. We affirm his conviction for first degree murder. We remand for resentencing, during which the superior court should further delineate some of the community custody conditions.

FACTS

We draw the facts primarily from trial testimony, including a jail interview of Appellant Christopher Almaral played to the jury. The prosecution arises from the death of Stephanie Curtis during the early morning of January 7, 2018. Christopher Almaral concedes he shot Curtis, but claims self-defense.

Christopher Almaral joined the North Side Varrio (NSV) street gang when twelve years old. NSV is an affiliate of the nationwide Norteño gang. "Norteño" translates to "northerner." The Sureños are a rival nationwide gang. "Sureño" translates to "southerner." Norteños wear the color red and Sureños the color blue.

The story of the prosecution begins on the night of January 6, 2018, in Yakima County. On that evening, Christopher Almaral and his friend Pedro Garcia de la Cruz patronized a casino in Toppenish. Almaral wore all red, the colors of the NSV gang. Due to Almaral's attire, Garcia de la Cruz initially isolated from him because of worry of a gang-related altercation. After this initial sequestering, the two played near one another on slot machines.

Stephanie Curtis was in the wrong place at the wrong time. Inside the casino, Curtis approached Pedro Garcia de la Cruz and Christopher Almaral. She had not known them before. Curtis left the casino with Almaral and Garcia de la Cruz. Almaral drove, Garcia de la Cruz sat in the front passenger seat, and Curtis rested in the middle of the rear seat. The trio drove to a residence in Mill Pond, outside of Ellensburg, to party at the

2

home of two of Almaral's friends.  On the way, the group stopped at a Toppenish gas station to purchase beer.  The three also stopped twice in Yakima respectively to procure condoms and a bottle of wine.  Later, the triad stopped on the side of the road for Stephanie Curtis to relieve herself.  During this stop, Almaral plucked a handgun from his jacket and shot it into the air, before redepositing it into his jacket.  The group stopped one more time so that the men could also relieve themselves.

Christopher Almaral testified that, during the final rest stop before arriving at Mill Pond and after he used restroom facilities, he saw Stephanie Curtis standing and shivering outside.  Almaral spoke of a blanket in his vehicle's trunk.  When Almaral accessed the trunk, Curtis spied a short-barreled shotgun within the trunk.  A curious Curtis questioned Almaral about the firearm.  Almaral explained that the object was a shotgun, and he demonstrated how it functioned.  Thereafter, Garcia de la Cruz returned from the restroom, at which time Almaral and Curtis reentered the car, while leaving the blanket and shotgun in the trunk.

On reaching the party site in Mill Pond, Christopher Almaral, Stephanie Curtis, and Pedro Garcia de la Cruz entered the residential trailer.  Almaral intook cocaine, and Curtis drank alcohol.  Almaral planned to spend the night at his friends' Mill Pond residence and take Curtis to her Yakima home the following day.  Almaral's friends, however, did not feel comfortable with Curtis spending the night in the trailer.  They informed Almaral that he alone could stay the night.

3

During the party, Pedro Garcia de la Cruz and Stephanie Curtis left to purchase tacos from a Jack in the Box restaurant. Based on the restaurant security footage, the two frequented the restaurant at 3:08 a.m. While in the Taco Bell drive-through, to the surprise of Garcia de la Cruz, Curtis kissed him. Not long after the duad returned, the partygoers indulged themselves in tacos, and Garcia de la Cruz stepped outside to smoke a cigarette. While Garcia de la Cruz remained outside, Christopher Almaral and Curtis drove from the trailer. When Garcia de la Cruz returned to the residence, one reveler informed him that Almaral mentioned, "'They'll be back.'" Report of Proceedings (RP) (Dec. 6, 2019) at 634.

Pedro Garcia de la Cruz, realizing he had left his keys in Christopher Almaral's vehicle, texted Almaral, at 3:29 a.m., to return to the trailer. At 3:33 a.m., Almaral replied via text, "'I'm just about ready to come back[.]'" RP (Dec. 6, 2019) at 647. Soon after, Almaral informed Garcia de la Cruz that he "'just wanted to talk to her [Curtis] about something.'" RP (Dec. 6, 2019) at 647. Almaral sent Garcia de la Cruz an additional message stating "'Just let me do this thing and I'll go.'" RP (Dec. 6, 2019) at 647. From this message, Garcia de la Cruz interpreted that Almaral desired sex with Curtis.

During trial, Christopher Almaral testified that he killed Stephanie Curtis in self-defense. According to Almaral, en route to Yakima along the old route on Canyon Road, he concluded that he could not drive, presumably due to his use of alcohol and cocaine.

4

Thus, Almaral stopped the car, awoke Stephanie Curtis, and explained to Curtis that he could not drive to Yakima. While the two stood outside the car, Almaral told Curtis that she needed to return home alone. Almaral offered to give Curtis cash and his blanket. According to Almaral, once Curtis realized she would be left alone in the middle of the cold night, an angry Curtis attempted to reenter Almaral's vehicle. Almaral blocked her from entering the car. Curtis attempted to push him away and hit him twice in the chest.

Christopher Almaral further testified at trial that Stephanie Curtis approached close enough to him to grab his handgun from his jacket pocket. He stepped back and held his hands in front of her to prevent her from nearing him. Almaral then walked to the back of his car to retrieve his blanket for Curtis. As he reached into the trunk for the blanket, Curtis rushed him and pushed him two feet from the car. Almaral heard a click and turned toward his vehicle to witness Curtis wielding the shotgun she had retrieved from the car's trunk.

According to Christopher Almaral's trial testimony, he slowly approached Stephanie Curtis with his left arm stretched. He placed his hand on the top of the gun and pointed it away. As Almaral attempted to disarm Curtis, she pulled away from him. Almaral apologized by commenting he felt guilty for leaving her alone in the cold, but that he could not finish the drive. Curtis drew nearer Almaral, put her forehead to his chest, gazed at his face, and kissed him. Suddenly Curtis kicked Almaral's crotch with her left knee. Almaral pushed Curtis. Curtis aimed at Almaral with the shotgun.

5

Almaral quickly drew his handgun and twice discharged the weapon.

Christopher Almaral testified that he approached Stephanie Curtis' body and tapped her foot with his. When Curtis did not respond, he recovered the shotgun and placed it in his car's trunk. Almaral returned to his friends' trailer to retrieve Pedro Garcia de la Cruz and take him home.

Christopher Almaral returned to Mill Pond without Stephanie Curtis. Almaral explained to Pedro Garcia de la Cruz that he had already left Curtis at her home. Almaral drove Garcia de la Cruz home without further mention of Curtis.

Between 7:00 and 7:30 a.m. on a snowy, freezing January 7, 2018, Jon Tollman observed a "flash of color" on the side of the road as he drove to work. RP (Dec. 4, 2019) at 321. Tollman stopped to look. Tollman found the body of Stephanie Curtis. Tollman called law enforcement.

At 7:44 a.m., Kittitas County Sheriff's Office Corporal James Woody arrived at the location of Stephanie Curtis' body. Corporal Woody surmised that Curtis did not die due to natural causes. Law enforcement identified Curtis by a Toppenish hospital bracelet she wore on her right wrist. The bracelet, dated January 5, 2018, listed her name and birthdate. Sheriff deputies confirmed Curtis' identity by her driver's license photograph viewed on a patrol car's computer.

Law enforcement transported Stephanie Curtis' remains for X-rays. The resulting radiographs revealed two bullets resting within Curtis' body, one in her head and the other in her torso.

On January 9, 2018, Stanley Adams, M.D. performed an autopsy on Stephanie Curtis' corpse. Dr. Adams concluded that a gunshot wound to her head killed her. Adams further opined that a first gunshot wound to Curtis' chest would have led to her death within a few minutes if the second bullet had not intervened.

Dr. Stanley Adams determined that the two bullets entered Stephanie Curtis at a sharp, downward angle. The bullet to the chest entered at a height of 54.5 inches from Curtis' left heel and exited from the back of her torso 46 inches from her left heel. Dr. Adams opined that the shot to Curtis' chest occurred from two inches to three feet away and that the shot to her head occurred within two feet away.

Law enforcement had yet to identify anyone who participated in the death of Stephanie Curtis. In Curtis' left jacket pocket, law enforcement located a Wapato Dollar Tree receipt dated January 6, 2018, and timestamped at 8:43 p.m. The Wapato Police Department obtained video surveillance footage from the Dollar Tree. The footage confirmed that Curtis visited the store with an individual later identified as Valentine Romero Ramirez.

On January 10, 2018, Wapato police contacted and interviewed Valentine Romero Ramirez, who informed detectives that he dropped Stephanie Curtis at the Toppenish

7

casino between 10:00 p.m. and midnight on the evening of January 6, 2018. Surveillance footage from the casino captured Curtis meeting Christopher Almaral and Pedro Garcia de la Cruz, although neither the casino nor law enforcement knew the two men's identity. The footage showed the trio leaving the casino in a 2016 red Mercedes-Benz. The footage did not display the vehicle's license plate.

On January 11, 2018, Kittitas County Sheriff's Office Detective Jerry Shuart saw a vehicle that matched the description of the Mercedes-Benz from the casino surveillance footage. Detective Shuart noticed the license plate number for the vehicle and identified the car's owner as Christopher Almaral's father, Dennis Almaral. Dennis registered the vehicle at a Benton City address. The Benton County Sheriff's Office told Kittitas County detectives that Dennis and Christopher Almaral resided in Benton City. Detectives compared Christopher's driver's license photo and photos from his Facebook account to the Toppenish casino security footage, after which they concluded that Christopher had driven the red Mercedes on the night of January 6, 2018.

After obtaining a search warrant, law enforcement searched Christopher Almaral's Ellensburg residence, where he lived with his mother and brother. Police seized, from the home, a modified, short-barreled shotgun and red pants matching those seen on the casino surveillance footage. During a search of Almaral's red Mercedes-Benz, detectives seized a red bandana and red jacket Almaral wore at the casino and a handgun later identified to have caused Curtis' death. The handgun had been stolen.

Christopher Almaral testified that, after ending Stephanie Curtis' life, he sought self-medication through drugs. He got high on drugs every day until law enforcement interviewed him on January 16, 2018.

On January 16, 2018, law enforcement detained Christopher Almaral and interviewed him. Detectives with the Kittitas County Sheriff's Office suspected that Stephanie Curtis' murder may have been gang-related. Accordingly, the detectives sought the assistance of Yakima Police Department Detective David Cortez, an expert in street gang culture. Detective Cortez attended the Kittitas County Sheriff's Office's interview of Christopher Almaral. At trial, the court declared Detective Cortez to be an expert in street gang culture. Cortez' trial testimony shed luminous light on gang culture, clothing, and language.

During the jail interview, Christopher Almaral acknowledged that he socialized with Stephanie Curtis at the Toppenish casino on January 6, 2018. Detective David Cortez asked Almaral whether he was a Norteño or whether he was involved with any street gangs that go by NSV.

Christopher Almaral responded to Detective David Cortez' questioning by identifying himself as a "Varrio." According to Detective Cortez, "varrio" like "barrio," in Spanish, means "neighborhood." RP at 702. Later in the interview, Almaral identified himself as a Norteño. Almaral explained that, when he met Curtis, he felt suspicious of

her.  He ruminated that Curtis was "scrap" and may have wished to lead him to calamity.

"Scrap" is a derogatory term used by Norteños for Sureños.  RP (Dec. 10, 2019) at 705.

During the custodial interview, Christopher Almaral commented about being

"flamed up" while at the casino, meaning that he bore only red clothes and accessories.

Br. of Resp't at 19.  Stephanie Curtis wore a blue jacket, a fact that worried Almaral that

she worked for the Sureños.  As a result of his suspicions, Almaral scrutinized his

environs while at the casino.  During the interview, Almaral added that Curtis approached

him and stated she wanted to get drunk.  An otherwise suspicious Almaral departed from

the casino with Curtis and Pedro Garcia de la Cruz.

During the jail interview, Detective David Cortez asked Christopher Almaral what

led to Stephanie Curtis' death.  Almaral responded that Curtis disclosed that she was

raised in foster homes and had no family in the Yakima Valley.  Curtis' comment

unnerved Almaral and caused him again to suspect a ruse.  According to Almaral, after

Curtis made this comment, she repeatedly requested Almaral's phone, which made

Almaral more wary.  At one point, Almaral told her:

> [Y]ou need to calm down.  This shit ain't right.  If it's a set up . . .
> fuck then, I don't know. . . .  I don't know what to say, you fucked up.

Exhibit 125.

During the interview, Christopher Almaral commented that "honestly . . . I pretty

much made myself out there," by going into the casino "[a]ll [flamed] up."  RP (Dec. 10,

2019) at 732. Stephanie Curtis interrogated him throughout the night. She asked Almaral why he wore all red. He responded that red was his favorite color. While in the car, Curtis also asked Almaral why he had a red bandana on his car's review mirror. Curtis remarked:

Oh well now it all makes sense, . . . [y]ou're a gangster, huh[?]

RP (Dec. 10, 2019) at 748.

Christopher Almaral told detectives that he left his friend, Pedro Garcia de la Cruz, in Mill Pond and informed him that he intended to leave with Stephanie Curtis to speak to her alone. Almaral wanted to determine why Curtis kept asking to access his phone. On the trip to Yakima, Almaral stopped his car and conversed with Curtis outside. Almaral intended to leave Curtis by the side of the road, but did not intend to hurt her. Curtis then stepped closer to Almaral and began hugging him. Curtis reached for his handgun. In response, Almaral shoved Curtis.

Christopher Almaral continued his narrative during the custodial questioning. Almaral and Stephanie Curtis argued while standing near the back of Almaral's car. Curtis attempted to reenter Almaral's vehicle, but he blocked her access. Almaral ask her about why she befriended him at the casino. Curtis did not answer, went to hug Almaral again, told him that she felt cold, and stated she wanted to return inside the car. While she hugged him, Curtis reached for his firearm a second time. Almaral drew his weapon

11

and shot Curtis twice with the barrel of his gun two to two and a half feet from her. He did not view Curtis lying on the ground, but returned to his car.

Christopher Almaral disclosed during the detective interview that, after shooting Stephanie Curtis, he retired to his Ellensburg home, where he drank alcohol and finished an eight ball, an eighth of an ounce of cocaine. Almaral told detectives he questioned his behavior.

PROCEDURE

The State of Washington charged Christopher Almaral, by second amended information, with one count each of (1) murder in the first degree of Stephanie Curtis, (2) possession of a stolen firearm, the handgun (3) possession of a controlled substance, cocaine, and (4) possession of an unlawful firearm, a short-barreled shotgun or rifle. The State further alleged that Almaral murdered Curtis with a firearm.

Christopher Almaral pled guilty to the possession of a controlled substance and possession of an unlawful firearm charges. In his statement on his plea of guilt, in his own words, Almaral wrote the factual basis for his guilt on the two charges:

> In Kittitas County on January 16, 2018 I possessed cocaine and a short barrelled [sic] shotgun, which is an unlawful firearm.

CP at 159. During the plea hearing, the superior court asked Christopher Almaral whether he had reviewed his guilty plea statement with his attorney, to which Almaral responded affirmatively. Almaral informed the court that he had no questions about the

document.  The court inquired how short a shotgun needed to be to qualify as a short-barreled shotgun.  The prosecutor answered, and defense counsel agreed, that the gun needed to be shorter than 26 inches in length.  The court then asked Almaral whether his shotgun measured less than 26 inches in length.  Almaral responded, "[y]es, sir."  RP (Dec. 3, 2019) at 69.

During trial, the State questioned Christopher Almaral about his custodial statement, in which he told detectives that he felt that Stephanie Curtis sought to trap him.  Almaral responded that, at the time of returning Curtis to Yakima, he was coming down from a high.  He could not remember what transpired during the early morning of January 7, 2018.  He further commented that, because the interviewing detectives asked about gangs, he believed the officers only wished to question him about gang involvement and not a murder.  He agreed understatedly, with the State's attorney, that his custodial statement differed from his trial testimony.

During trial, Christopher Almaral acknowledged that, at the time of the shooting, he was 6 feet 1 inch tall and weighed 260 to 270 pounds, while Stephanie Curtis stood 5 feet 6 inches tall and weighed 140 pounds.  Almaral also testified that, despite not remembering the events of early morning January 7, Curtis never actually grabbed for his handgun, contrary to what he told detectives during the interview, and that she never pulled the trigger of the shotgun.  Almaral admitted that Curtis never threatened to kill him.

No. 37411-4-III
*State v. Almaral*

The superior court delivered numerous standard jury instructions for the crimes

charged. Jury instruction 12, the first degree murder instruction, read:

> To convict the defendant of the crime of murder in the first degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about January 7, 2018, the defendant acted with intent to cause the death of Stephanie Curtis;
> (2) That the intent to cause the death was premeditated;
> (3) That Stephanie Curtis died as a result of the defendant's acts; and
> (4) That any of these acts occurred in the State of Washington.
> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
> On the other hand, if after weighing all of the evidence you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

Clerk's Papers (CP) at 210. The trial court provided the jury with instructions on the

charge of the lesser included offense of second degree murder with a firearm. The court

further instructed the jury, in jury instruction 13, how to address two levels of a crime:

> The defendant is charged in count 1 with Murder in the First Degree. If, after full and careful deliberation on this charge, you are not satisfied beyond a reasonable doubt that the defendant is guilty, then you will consider whether the defendant is guilty of the lesser crime of Murder in the Second Degree.
> When a crime has been proved against a person, and there exists a reasonable doubt as to which of two or more degrees that person is guilty, he or she shall be convicted only of the lowest degree.

CP at 211.

14

The superior court delivered Christopher Almaral's requested self-defense instructions. Additionally, the court provided a first aggressor instruction. The first aggressor instruction provided:

> No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self-defense and thereupon kill another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the fight, then self-defense is not available as a defense.

CP at 216. Almaral did not object to the inclusion of the first aggressor instruction. Neither counsel mentioned the latter instruction during closing arguments.

At the outset of the State's closing argument, the prosecutor told the jury: "[t]he State has the burden of proof. Hold us to that." RP (Dec. 11, 2019) at 3. During its closing argument, the State attacked Christopher Almaral's credibility and highlighted that he provided two versions of events leading to Stephanie Curtis' death. Throughout closing, the prosecutor repeatedly referred to Almaral as a Norteño:

> At the start of this case, I suggested that in some ways this case would be easy. . . . What I did not anticipate at that time is that as you sat here deliberating about this case you would be sitting with two different versions of events from Mr. Almaral.
> . . . .
> You can call these versions one and versions two. In version one while talking with law enforcement we have a *flamed up Norteno*. He is irritated, he's upset. He's being bugged. He's being mad-dogged. He is being set up. He is suspicious for hours until he finally acts upon that driving Ms. Curtis into the [Yakima River] canyon where she was killed.
> In version two we have a *kinder, gentler, Norteno*. We have a gentlemen who intended no harm to Ms. Curtis. We have a *Norteno* who

wasn't looking for trouble just trying to fly under the radar screen. A *Norteno* who was unable to drive his vehicle to get Ms. Curtis safely home.

RP (Dec. 11, 2019) at 1-2 (emphasis added).

In this case, I would suggest that there's an attempt to have an oratory [sic] illusion because we now have two versions that really are not lining up. We have two versions a [sic] old version, *the old Norteno flamed up Norteno*. You see, you see, you look at this, the new version, *the kinder, gentler version*, which we see here. Can you decipher where the truth lies?

RP (Dec. 11, 2019) at 11 (emphasis added).

Does common sense and the facts presented in this case indicate that on January 6th or 7th Mr. Almaral was a *flamed up Norteno* looking for trouble, or that he was a *new, kinder, gentle Norteno* flying under the radar screen not desiring to harm anyone?
*He was a kinder, gentler Norteno* going into territory, such as the casino.

RP (December 11, 2019) at 18 (emphasis added). Christopher Almaral did not object to the State's attorney's remarks.

During its argument, the prosecution displayed a PowerPoint presentation to the jury. The presentation included a slide relating to jury instruction 12, the instruction enumerating the elements of murder in the first degree. CP 286, 293, 312. The slide read, in relevant part:

INSTRUCTION 12
- That on January 7, 2018, the defendant acted with intent to cause the death of Stephanie Curtis;
   - That the intent to cause death was premeditated;
   - That Stephanie Curtis died as a result of the defendant's acts; and
   - That any of these acts occurred in the State of Washington.
   - PROVEN BEYOND A REASONABLE DOUBT YOUR DUTY

TO RETURN A VERDICT OF GUILTY

CP at 286, 293, 312 (boldface omitted). We label this slide as "the first degree murder

slide." Note that the prosecution headlined the slide as referencing jury instruction 12.

Nevertheless, the State omitted the two paragraphs at the end of instruction 12 and added

language beyond the content of the jury instruction: "PROVEN BEYOND A

REASONABLE DOUBT YOUR DUTY TO RETURN A VERDICT OF GUILTY."

Christopher Almaral did not object to the showing of this slide.

The first time the prosecutor showed the first degree murder slide, he stated:

> The last part there of that instruction—*If you find that the state has
> proven those elements beyond a reasonable doubt it will be your duty to
> return a verdict of guilty.*

RP (Dec. 11, 2019) at 5 (emphasis added). On the second occasion the slide appeared,

the State's attorney commented:

> So, [the slide] looks different right now. That's because I want you
> to notice that I have highlighted in red . . . what I believe without saying
> anything further, you can already say that has been proven beyond a
> reasonable doubt.
> And the defendant acted with intent to cause the death of Stephanie
> Curtis. She died as a result of the defendant's acts, that the acts occurred in
> the state of Washington.
> As to Murder 1, *all that is left is whether the intent was
> premeditated.*

RP (Dec. 11, 2019) at 8 (emphasis added). When showing the slide for the last time, the

prosecutor discussed premeditation and the absence of self-defense:

> So, murder in the first degree. January 7; Intent to cause the death of

17

Stephanie Curtis; That intent was premeditated; She died as a result of those acts; The acts occurred in the State of Washington. *The screen is now full*.

RP (Dec. 11, 2019) at 28 (emphasis added).

The prosecutor's PowerPoint presentation included a slide relating to the lesser included offense of murder in the second degree:

> Murder One v. Murder Two
> - Murder one is charged
> - Murder two is considered lesser included offense
> - Difference -
>      - Premeditation
>      - Intentional Killing
> - NOT CONSIDER MURDER TWO UNTIL DECIDE
> PREMEDITATION DOES NOT EXIST

CP at 282 (boldface omitted). We label this slide as "the second degree murder" slide.

Christopher Almaral also did not object to this slide. While presenting this second slide to the jury, the prosecutor intoned:

> Let's talk about murder in the second degree. Without considering anything else, every element has been matched up. The date, that the acts were done with intent, that she died as a result of those acts, and those acts occurred in the State of Washington. With nothing further if you were to get to murder in the second degree. Check, check, check.

RP (Dec. 11, 2019) at 8.

The jury found Christopher Almaral guilty of first degree murder and that he committed the crime with a firearm. The jury found Almaral not guilty of possession of a stolen firearm.

18

In addition to sentencing Christopher Almaral to a lengthy term in prison, the superior court imposed 36 months' community custody for the first degree murder charge and 12 months' community custody for the possession of a controlled substance charge. The relevant conditions of the imposed community custody include the following:

> 7. Do not associate with persons involved in the purchase, possession, consumption, manufacture, or sale of illegal drugs.
> . . . .
> 14. Do not possess any gang or gang related paraphernalia.
> 15. Do not use any gang names or monikers.
> 16. Do not engage in gang activities in any form, including but not limited to wearing of colors; flashing/showing signs; associating with gang members, prospects, and associates; attending meetings; or "doing work.["]
> 17. Do not associate with persons involved in gang activities.
> 18. Do not enter or remain in any establishment, home, business, or other location that is owned, operated, or used by the gang.

CP at 378.

## LAW AND ANALYSIS

On appeal, Christopher Almaral assigns numerous errors to the superior court proceedings. First, he argues that he did not knowingly, voluntarily, and intelligently plead guilty to possession of unlawful firearm. Second, Almaral contends that the State's attorney committed prosecutorial misconduct when showing the jury misleading PowerPoint slides and when emphasizing Almaral's membership in the Norteño gang. Third, he maintains that his trial counsel performed ineffectively when failing to object to a first aggressor jury instruction. Fourth, he challenges the validity of his conviction for

19

possession of a controlled substance. Fifth, he seeks to void some of his community custody conditions. We address these assignments of error in such order.

Possession of Unlawful Firearm Plea

Christopher Almaral asserts that the factual basis for his guilty plea to the possession of an unlawful firearm charge is insufficient to demonstrate that he entered the plea knowingly, voluntarily, and intelligently. He argues that the record does not mention his mental state at the time of the alleged offense or any mens rea element. We agree.

Due process requires that a guilty plea be voluntary, knowing, and intelligent. *State v. R.L.D.*, 132 Wn. App. 699, 705, 133 P.3d 505 (2006). A defendant must not only know the elements of the offense, but also must understand that the alleged criminal conduct satisfies those elements. *State v. R.L.D.*, 132 Wn. App. at 705.

RCW 9.41.190 governs unlawful firearms. The statute declares, in relevant part:

> (1) Except as otherwise provided in this section, it is unlawful for any person to:
> (a) Manufacture, *own*, buy, sell, loan, furnish, transport, or *have in possession or under control*, any . . . short barreled shotgun, or short-barreled rifle.

(Emphasis added.) RCW 9.41.010(29) defines a "short-barreled rifle" as:

> a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle by any means of modification if such modified weapon has an overall length of *less than twenty-six inches*.

(Emphasis added.) RCW 9.41.010(30) also defines a "short-barreled shotgun" as a shotgun measuring less than twenty-six inches in overall length.

RCW 9.41.190 does not expressly identify a means rea requirement. The Washington Supreme Court has chosen not to read the statute as permitting strict liability for possession. *State v. Williams*, 158 Wn.2d 904, 915-16, 148 P.3d 993 (2006). Because a citizen possesses a constitutional right to bear arms under both the United States and Washington State Constitutions, the Supreme Court also does not want to impose criminal liability unless the possessor knew of the characteristics of the gun rendering possession unlawful. *State v. Williams*, 158 Wn.2d 904, 913 (2006). Therefore, the State must prove that the accused have: (1) knowledge that he or she possesses a short-barreled shotgun or rifle, and (2) knowledge of the weapon's characteristics that renders possession of the weapon unlawful. *State v. Williams*, 158 Wn.2d 904, 909 (2006). The State carries its burden if it proves that the accused should have known of the unlawful characteristics of the firearm. *State v. Williams*, 158 Wn.2d 904, 915-16 (2006). In *Williams*, the court added that the State may not encounter difficulty establishing constructive knowledge when the accused possessed the firearm over an extended period of time.

The State charged Christopher Almaral with possession of an unlawful firearm. The charging language for the count stated that "CHRISTOPHER ALMARAL . . . on or

about January 16, 2018, did *knowingly* . . . have in possession or under control, any . . .

short-barreled shotgun." CP at 57 (emphasis added).

Before the plea agreement with Christopher Almaral, the State filed proposed jury

instructions. One instruction read that the State charged Almaral with the crime of

possession of an unlawful firearm, a charge which "alleges that in the State of

Washington, on or about January 16, 2018 the defendant did *knowingly* have in his

possession or under his control, a short-barreled shotgun." CP at 63 (emphasis added).

Another instruction read that "A person commits the crime of possession of a short-

barreled firearm when he *knowingly* owns or has in his possession or control any short-

barreled firearm." CP at 126 (emphasis added). A third instruction, the to-convict

instruction for the unlawful possession charge, identified, as an element, "That on or

about January 16, 2018, the defendant *knowingly* owned a short-barreled firearm or

knowingly had a short-barreled firearm in his possession or control." CP at 128

(emphasis added). Neither the information, nor the proposed jury instructions, expressly

read that Almaral knew or should have known of the characteristics of the firearm.

The factual basis for Christopher Almaral's plea of guilty to the possession of

unlawful firearm charge tersely declared: "In Kittitas County on January 16, 2018[,] I

possessed . . . a short barrelled [sic] shotgun, which is an unlawful firearm." CP at 159.

The trial court asked Almaral at the plea hearing whether the length of the shotgun he

possessed extended less than twenty-six inches, and Almaral answered, "Yes, sir." RP

(Dec. 3, 2019) at 69. Nevertheless, the court did not ask Almaral and Almaral did not volunteer that he knew the length of the barrel on January 16, 2018.

A person who owns or possesses a firearm, but knows not the characteristics rendering the gun unlawful, presumably would assess its unlawful characteristic before pleading guilty to unlawful possession. For example, if a person had not previously measured the length of a shotgun's barrel, he would likely measure it and determine that it was shorter than twenty-six inches before agreeing to plead guilty. Nevertheless, his knowledge of the unlawful length of the shotgun at the time of the plea does not mean he possessed this knowledge on the charging date.

The record does not reflect that Christopher Almaral knew or should have known at the time of possession of the unlawful length of the shotgun. If Almaral had such knowledge the State should have ensured that the factual statement in the guilty plea expressed that knowledge. Without such confirmation, we cannot conclude that Christopher Almaral knowingly and intelligently pled guilty.

Possession of a Controlled Substance Conviction

Christopher Almaral argues that his conviction for possession of a controlled substance must be vacated, pursuant to *State v. Blake*, 197 Wn.2d 170, 481 P.3d 521 (2021). The State agrees. So do we.

23

In *State v. Blake*, the Washington Supreme Court held that the state's strict liability drug possession statute, former RCW 69.50.4013(1), violated due process under both the state and federal constitutions. The court found the statute void.

Before trial, Christopher Almaral pled guilty to possession of a controlled substance, cocaine, in violation of former RCW 69.50.4013. We remand for vacation of Almaral's conviction for possession of a controlled substance and for resentencing based on a lower offender score.

First Degree Murder Conviction

*Slide Show*

Christopher Almaral assigns numerous error in an attempt to reverse his murder conviction. Almaral first argues that the prosecutor committed misconduct during closing arguments by presenting to the jury two PowerPoint slides containing improper arguments. Almaral maintains that, in the first degree murder slide, the State manipulated jury instruction 12 by writing that the State had established Almaral's guilt. According to Almaral, the State also discouraged addressing second degree murder when, in the second degree murder slide, the State directed the jury to reject the first degree murder charge before addressing the lesser included crime. Almaral emphasizes the all caps and bolded language on the slides misinformed the jury that Almaral's guilt was a foregone conclusion and that the jury had a duty to find Almaral guilty of first degree

murder. Almaral characterizes the PowerPoint slides as flagrant and ill-intentioned misconduct.

The State responds that its PowerPoint slides contained accurate and appropriate argument when considered alongside the prosecutor's spoken argument when showing the slides. The State highlights that the jury was instructed to apply the law contained within the jury instructions and that counsels' comments did not constitute law.

To prove prosecutorial misconduct, a defendant must show that the prosecuting attorney's conduct was both improper and prejudicial. *State v. Weber*, 159 Wn.2d 252, 270, 149 P.3d 646 (2006). The accused deserves reversal of a conviction when misconduct creates a substantial likelihood of affecting the jury's verdict. *State v. Weber*, 159 Wn.2d 252, 270 (2006). When analyzing misconduct and prejudice, an appellate court reviews a prosecutor's actions in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given. *State v. Russell*, 125 Wn.2d 24, 85-86, 882 P.2d 747 (1994). "Highly prejudicial images may sway a jury in ways that words cannot." *In re Personal Restraint of Glasmann*, 175 Wn.2d 696, 707, 286 P.3d 673 (2012) (plurality opinion).

Christopher Almaral did not object at trial to the showing of either of the slides challenged on appeal. When a defendant fails to object at trial to the prosecutor's alleged misconduct, the defendant must also demonstrate that the misconduct was so flagrant and ill intentioned that an instruction would not have cured the prejudice. *In re Personal*

25

*Restraint of Glasmann*, 175 Wn.2d 696, 704 (2012). The absence of a motion for mistrial at the time of the argument strongly suggests to a court that the argument or event in question did not appear critically prejudicial to an appellant in the context of the trial. *State v. Swan*, 114 Wn.2d 613, 635, 790 P.2d 610 (1990).

*First Degree Murder Slide*

We isolate the two for purposes of review. The first degree murder slide, captioned jury instruction 12, listed elements of first degree murder and then added: "PROVEN BEYOND A REASONABLE DOUBT YOUR DUTY TO RETURN A VERDICT OF GUILTY." CP at 286, 293, 312 (boldface omitted).

Some readers of the PowerPoint slide, when reading the slide in isolation, might conclude that jury instruction 12 instructed the jury that the State had proven beyond a reasonable doubt the crime of first degree murder. The slide should have separated the closing comments from the caption of instruction 12. Nevertheless, when we review the slide in the context of the entire case, we do not consider it misleading.

The jury also had available jury instruction 12 and could readily tell that the "proven" language was not found therein. When addressing the final part of the slide, the prosecutor told the jury, "*If* you find that the state has proven those elements beyond a reasonable doubt *it will be your duty to return a verdict of guilty*." RP (Dec. 11, 2019) at 5 (emphasis added). The second time the slide appeared in the State's presentation, the prosecutor explained that the only element at issue regarding first degree murder was

premeditation.  The third and final time the prosecutor presented the above slide occurred

after his argument on premeditation and the absence of self-defense: "The screen is now

full."  RP (Dec. 11, 2019) at 28.  The prosecutor meant that all elements were now

highlighted on screen, because the State had carried its burden as to each.  The State's

attorney never told the jury that the slide constituted the language in the true jury

instruction.

Christopher Almaral posits *In re Personal Restraint of Glasmann*, 175 Wn.2d 696

(2012) as controlling.  In *Glasmann*, our high court held the State committed flagrant and

ill intentioned misconduct by presenting the jury with altered exhibits.  The State

presented the jury with Edward Glasmann's booking photograph altered by the inclusion

of "phrases calculated to influence the jury's assessment of Glasmann's guilt and

veracity."  *In re Personal Restraint of Glasmann*, 175 Wn.2d at 705.  The State presented

at least five slides of Glasmann's picture with different captions, including "'DO YOU

BELIEVE HIM?'" "'WHY SHOULD YOU BELIEVE ANYTHING HE SAYS

ABOUT THE ASSAULT?'" and "'GUILTY.'"  *In re Personal Restraint of Glasmann*,

175 Wn.2d at 701-02, 706 (2012).

We deem the prosecution's slides in Christopher Almaral's prosecution pale when

compared to the altered exhibits and photographs in the Edward Glasmann prosecution.

The State's attorney's presented no images in the slides in Almaral's case.  We hold that

the State committed no misconduct, let alone flagrant and ill intentioned misconduct.

27

*The Second Degree Murder Slide*

The second degree murder slide directed the jury in bold print not to consider the second degree murder charge until deciding whether premeditation existed. The slide did not directly instruct the jury to decide whether or not Christopher Almaral committed first degree murder, before deciding if he committed second degree murder. Nevertheless, Almaral argues the slide strongly implied that the jury should not address the lesser included offense at the same time as discussing the higher offense. Almaral further contends that this slide thereby misstated the law.

A prosecuting attorney commits misconduct by misstating the law. *State v. Allen*, 182 Wn.2d 364, 373, 341 P.3d 268 (2015). The Washington Supreme Court declared with regard to a lesser included instruction:

> When a jury is instructed on lesser included or lesser degrees of charged crimes, it should also be instructed that *it is to first consider the crime charged and if after full and careful consideration of the evidence it cannot agree on a verdict as to that crime, it may then proceed to arrive at a verdict on a lesser crime*.

*State v. Labanowski*, 117 Wn.2d 405, 414, 816 P.2d 26 (1991).

Christopher Almaral faults the PowerPoint slide for requiring the jury to affirmatively and unanimously acquit him of first degree murder before deciding whether to convict of second degree murder, rather than simply allowing the jury to consider the lesser included offense after they fail to agree on the higher crime. We do not read the slide as Almaral reads it. The slide tells the jury to focus on premeditation first, which

should have been the focus when addressing first degree murder and second degree murder. The State's suggestion to the jury that it should address premeditation first posed a logical method of addressing the charges. The State did not suggest that this language was found in any jury instruction or that the trial court instructed the jury to follow this approach.

Jury instruction 13 informed the jury how to deliberate when resolving which, if any, level of a crime the accused committed. The PowerPoint slide did not conflict with the instruction.

*Norteño Reference*

Christopher Almaral contends that the prosecutor committed misconduct by appealing to the jury's passion when repeatedly referring to him as a Norteño throughout the State's closing argument. Almaral contends that the State's repeated references to him being a Norteño appealed to the jury's implicit racial bias. By framing him as a Norteño, the State highlighted his Latino race for the jury and undermined his presumption of innocence by suggesting that a member of a Latino-associated group is more likely to be guilty of a violent crime. The State responds that the prosecutor did not err by referring to Christopher Almaral as a Norteño, because reasonable inferences from the evidence demonstrated that, on the day Almaral killed Stephanie Curtis, he was a member of the NSV street gang.

29

A prosecutor should not make arguments designed to inflame the jury's passions or prejudices. *In re Personal Restraint of Glasmann*, 175 Wn.2d 696, 704 (2012). While a prosecutor is granted wide latitude to draw reasonable inferences from the evidence, he or she must seek convictions based only on probative evidence and sound reason. *State v. Thorgerson*, 172 Wn.2d 438, 448, 258 P.3d 43 (2011); *State v. Cateneda-Perez*, 61 Wn. App. 354, 363, 810 P.2d 74 (1991).

During its closing argument, prosecutor referred to Almaral as a Norteño nine times. Three times, the State's attorney called Almaral a "flamed up Norteño" and four times a "kinder" or "gentler" Norteño.

We find no decision that includes the prosecution's labeling the accused as either a Norteño or a Sureño. We find cases, wherein the State's attorney, during argument, often referred to the accused as a gang member. Courts do not find this reference to a gang to be misconduct unless the prosecution presented no evidence of gang activity. *Brown v. State*, 291 Ga. 887, 734 S.E.2d 41, 45 (2012). To the contrary, when evidence presented shows the accused to be a gang member or the crime to be gang related, the prosecution may mention such during summation. *Commonwealth v. Leach*, 73 Mass. App. Ct. 758, 901 N.E.2d 708, 717 (2009); *People v. Sims*, 265 Ill. App. 3d 352, 638 N.E.2d 223, 230 (1994). In *People v. Samuels*, 228 P.3d 229 (Colo. App. 2009), the reviewing court held that the prosecution committed no misconduct by repeatedly referring to the accused by his gang nickname, when witnesses used the nickname.

30

During his custodial interview played to the jury, Christopher Almaral admitted to being a member of the Norteño gang. He also described himself as "flamed up" the night of the murder because of his red dress. He justified his shooting of Stephanie Curtis in part because of his belief that she worked for the rival Sureño gang. Thus, his gang membership and the identity of his gang constituted evidence before the jury. The State's attorney may have unbecomingly called Almaral a "kindler, gentler Norteño," but the law does not preclude sarcasm. The State's attorney did not commit misconduct by referencing Almaral as a Norteño.

Christopher Almaral also asserts that, at trial, the State never disputed that he was no longer involved with NSV and that he worked twelve-hour days at a legitimate job at the time of Stephanie Curtis' death. Almaral maintains that the State, nevertheless, focused on his status as a former gang member to obtain a conviction, instead of highlighting the specific evidence presented in the case. We disagree with Almaral. In his custodial interview, Almaral declared himself a Norteño and never suggested that he had left the gang.

*Ineffective Assistance of Counsel*

Christopher Almaral asserts that defense counsel provided ineffective assistance by failing to object to the first aggressor jury instruction, because the facts did not warrant the instruction and the instruction only served to undermine his claim of self-defense. The State responds that the first aggressor instruction applied because Stephanie

31

Curtis could have believed that she fought for her survival before being killed, since

Almaral intended to abandon her at night and in freezing temperatures. The State further

contends that, even if evidence did not merit the instruction, its inclusion did not

prejudice Almaral's defense because the prosecutor did not mention the instruction

during argument.

To prevail on an ineffective assistance of counsel claim, the defendant must

demonstrate (1) that defense counsel's representation was deficient, and (2) that the

deficient representation prejudiced the defendant. *State v. Estes*, 193 Wn. App. 479, 488,

372 P.3d 163 (2016), *aff'd*, 188 Wn.2d 450, 395 P.3d 1045 (2017). Representation is

deficient if, after considering all the circumstances, the performance falls below an

objective standard of reasonableness. Prejudice exists if there is a reasonable probability

that, except for counsel's errors, the result of the proceeding would have differed. *State*

*v. Estes*, 193 Wn. App. at 488; *Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct.

2052, 80 L.Ed.2d 674 (1984). Criminal defendants may rebut the presumption of

reasonable performance by demonstrating that no conceivable legitimate tactic explains

counsel's performance. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011); *State v.*

*Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004).

To determine whether defense counsel erred by failing to object to the first

aggressor instruction, we first consider whether the instruction was error. A first

aggressor may not claim self-defense. *State v. Grott*, 195 Wn.2d 256, 266, 458 P.3d 750

(2020). The right of self-defense cannot be successfully invoked by an aggressor or one who provokes an altercation. *State v. Riley*, 137 Wn.2d 904, 909, 976 P.2d 624 (1999). This rule arises from the the aggressor's victim defending herself against the aggressor and thus employing lawful force. *State v. Grott*, 195 Wn.2d 256, 266 (2020). The defendant's provoking act must be an intentional act that the jury could reasonably assume would provoke a belligerent response from the victim. *State v. Espinosa*, 8 Wn. App. 2d 353, 362, 438 P.3d 582 (2019). The provoking act does not need to be unlawful. *State v. Sullivan*, 196 Wn. App. 277, 290-91, 383 P.3d 574 (2016).

The question of whether a first aggressor instruction should be given is a highly fact-specific inquiry, such that broad, bright-line rules are rarely appropriate. *State v. Grott*, 195 Wn.2d 256, 267 (2020). When the court reviews whether the evidence sufficed to support giving a first aggressor instruction, the court must carefully consider the specific evidence presented at trial in the light most favorable to the requesting party. *State v. Grott*, 195 Wn.2d at 267.

Christopher Almaral contended that he shot Stephanie Curtis when she reached for the handgun in his coat pocket. Assuming Curtis did so, she reached for the gun only after knowing that Almaral intended to abandon her in freezing temperatures in the early morning along a sparse rural road. She also reached for the gun with the knowledge that Almaral possessed two guns and had fired one before. She did not necessarily reach for the gun to kill Almaral, but to insure her safe return home. Curtis could have expected to

die from freezing weather or for Almaral to shoot her as he left the scene. We find no cases about being left alone in a cold environment. Nevertheless, when we view the evidence in the light favorable to the State, Almaral's conduct could have reasonably provoked a panicked Curtis to justifiably reach for the gun.

Because the first aggressor instruction fit the facts, Christopher Almaral does not show that his trial counsel performed ineffectively. Almaral also demonstrates no prejudice.

### *Cumulative Error*

Christopher Almaral contends that the cumulative effect of the prosecutor's and defense counsel's errors deprived him of a fair trial. The cumulative error doctrine "may warrant reversal, even if each error standing alone would otherwise be considered harmless. The doctrine does not apply where the errors are few and have little or no effect on the outcome of the trial." *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006) (citation omitted). Because we find no error, we discern no cumulative error.

### Community Custody Conditions

Christopher Almaral challenges six community custody conditions imposed as part of his sentence, numbers 7 and 14 through 18, as unconstitutionally vague. He argues that each condition raises many unanswered questions, such that the conduct they proscribe is not sufficiently definite and the conditions are susceptible to arbitrary

enforcement. Almaral requests that this court remand for the trial court to strike the offending conditions from the judgment and sentence.

The State concedes that community custody conditions 14 through 18 are unconstitutionally vague and requests that this court remand for the trial court to modify the conditions to be more specific. The State does not address condition 7.

We do not necessarily discern that community custody conditions 14 to 18 suffer from undue vagueness. Nevertheless, in our discretion, we accept the State's concession. Even if not unduly vague, the five conditions could improve by clarification. We review only community custody condition 7.

The accused may raise a vagueness challenge to conditions of community custody for the first time on appeal. *State v. Bahl*, 164 Wn.2d 739, 745, 193 P.3d 678 (2008). A community custody condition is unconstitutionally vague if it fails to define the offense with sufficient precision that a person of ordinary intelligence can understand it or (2) it does not provide standards sufficiently specific to prevent arbitrary enforcement. *State v. Duncalf*, 177 Wn.2d 289, 296-97, 300 P.3d 352 (2013); *State v. Bahl*, 164 Wn.2d 739, 752-53 (2008). The community custody condition is unconstitutionally vague if either requirement is unsatisfied. *State v. Bahl*, 164 Wn.2d at 753. The party challenging a condition carries the burden of proving the law to be unconstitutional beyond a reasonable doubt. *City of Spokane v. Douglass*, 115 Wn.2d 171, 177, 795 P.2d 693 (1990).

This court proceeds cautiously when interpreting vague statute when the statute implicates the First Amendment to the United States Constitution's right to association. *City of Bellevue v. Lorang*, 140 Wn.2d 19, 31, 992 P.2d 496 (2000). Community custody conditions may only limit a probationer's First Amendment right if the restriction is "'reasonably necessary to accomplish the essential needs of the state and public order.'" *State v. Bahl*, 164 Wn.2d 739, 757 (2008) (quoting *Malone v. United States*, 502 F.2d 554, 556 (9th Cir. 1974)).

Christopher Almaral's community custody condition 7 declares:

> 7. Do not associate with persons involved in the purchase, possession, consumption, manufacture, or sale of illegal drugs.

CP at 378. When challenging this condition, Almaral poses the questions:

> What does "associate" mean? Does it include, for example, interactions with coworkers[?] Does it include buying something from a clerk at a store?
> Is Mr. Almaral prohibited from interacting with people who are involved with drugs even if he does not *know* of that involvement? How recent must the person's drug involvement be?

Br. of Appellant at 41.

While Christopher Almaral correctly characterizes the community custody condition 7 as lacking particularity, the condition need not be so specific.

> [S]ome level of ambiguity will always remain in community custody conditions. However, "impossible standards of specificity are not required." And a convicted person is not entitled to complete certainty as to the exact point at which his actions would be classified as prohibited

conduct. Instead, all that is required is that the proscribed conduct is sufficiently definite in the eyes of an ordinary person.

*State v. Hai Minh Nguyen*, 191 Wn.2d 671, 681, 425 P.3d 847 (2018) (citations omitted) (quoting *City of Seattle v. Eze*, 111 Wn.2d 22, 26,759 P.2d 366 (1988) (internal quotations omitted).

An ordinary, reasonable person understands that community custody condition 7 only restricts Christopher Almaral from associating with people he knows participates in illegal drug activity. The restriction only applies to those involved in the present tense, not those who imbibed years earlier. One does not necessarily associate with a coworker by standing next to her while working. One associates with one involved in drug activity, when one knowingly socializes with such person.

## CONCLUSION

We affirm Christopher Almaral's conviction for murder in the first degree. We vacate Almaral's conviction for possession of a controlled substance and vacate his plea of guilty on the possession of unlawful firearm charge. We remand for further proceedings on the possession of unlawful firearm charge and for resentencing. During resentencing, the court should renumber Almaral's offender score. The superior court should also provide definition to community custody conditions 14 through 18.

No. 37411-4-III
*State v. Almaral*


A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.


_____
Fearing, J.

WE CONCUR:


_____
Siddoway, C.J.

_____
Lawrence-Berrey, J.

38