The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
December 22, 2022

**2022COA144**

**No. 20CA1697, *People v. Garcia* — Constitutional Law — Due Process — Sixth Amendment — Right to an Impartial Jury — Confrontation Clause — Public Policy Exception; Criminal Law — Trials — Trial Proceedings — Voir Dire — COVID-19 — Face Masks**

A division of the court of appeals considers a criminal

defendant's challenge to the precautions the trial court

implemented during trial in response to the COVID-19

pandemic.  Specifically, he contends that the court violated his

constitutional rights by (1) requiring the jury venire and impaneled

jurors to wear masks covering their noses and mouths; and

(2) seating the impaneled jury in the courtroom gallery (as opposed

to the jury box).  Addressing a novel issue in Colorado, the division

concludes that the trial court's COVID-19 precautions did not

violate the defendant's constitutional rights. Because the division

also rejects his other claims, the division affirms the judgment.

COLORADO COURT OF APPEALS     **2022COA144**

Court of Appeals No. 20CA1697
City and County of Denver District Court No. 19CR5690
Honorable Shelley I. Gilman, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Kenneth L. Garcia,

Defendant-Appellant.

## JUDGMENT AFFIRMED

Division V
Opinion by JUDGE NAVARRO
Welling and Johnson, JJ., concur

Announced December 22, 2022

Philip J. Weiser, Attorney General, Brian M. Lanni, Assistant Attorney General II, Denver, Colorado, for Plaintiff-Appellee

Lucy H. Deakins, Alternate Defense Counsel, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Kenneth L. Garcia, appeals the judgment of conviction entered on jury verdicts finding him guilty of one count of theft from an at-risk person — $500 or more, one count of theft — $20,000-$100,000, and two counts of violating the pawnbroker act.  Garcia challenges the precautions the trial court implemented during trial in response to the COVID-19 pandemic.  Specifically, he contends that the court violated his constitutional rights by (1) requiring the jury venire and impaneled jurors to wear masks covering their noses and mouths; and (2) seating the impaneled jury in the courtroom gallery (as opposed to the jury box).  Addressing a novel issue in Colorado, we conclude that the trial court's COVID-19 precautions did not violate Garcia's constitutional rights.  Because we also reject his other claims, we affirm the judgment.

## I.     Background

¶ 2     Dr. Sylvia Kerr, age seventy-eight, hired Garcia to fix a fence on her property.  They agreed that Garcia would complete the work while Kerr was out of town.  Upon Kerr's return, she discovered that someone had burglarized her home and had stolen numerous items

of significant value. Kerr questioned Garcia, who denied any knowledge about the missing items.

¶ 3        The police found some of Kerr's missing property at two different pawnshops; both had documents designating "Kenneth Garcia" as the person attempting to make the sales. The police, during a traffic stop of Garcia, also found him in possession of Kerr's personal checkbooks and other property from her home. During a police interview, Garcia admitted to having more items belonging to Kerr in his storage unit, which the police verified after searching the unit pursuant to a search warrant. Garcia also confirmed that he had sold some of Kerr's items to a pawnshop. But in that same interview and (through counsel) at trial, Garcia maintained that he had collected Kerr's property and placed it in his storage unit for safekeeping, with the intent to return the items to her.

¶ 4        The jury found Garcia guilty of all charges. The court sentenced him to a total of nine years in prison.

¶ 5        On appeal, Garcia contends that the trial court committed reversible error by (1) requiring the jury venire and impaneled jurors to wear masks covering their noses and mouths; (2) seating

the impaneled jury in the courtroom gallery (as opposed to the jury box); (3) failing to seat prospective jurors randomly during voir dire; (4) conducting jury selection without Garcia present; (5) denying his motion for judgment of acquittal; (6) admitting the testimony of an unqualified expert witness; and (7) permitting multiple instances of prosecutorial misconduct. We disagree with all of Garcia's contentions of error.

## II. Allegations Related to Jurors and COVID-19 Protocols

¶ 6 Garcia argues that the trial court's COVID-19 protocols affecting prospective and impaneled jurors violated his constitutional rights. He alludes generally to his rights to due process, to present a defense, to be present at trial, to confrontation, to a fair and impartial jury, to effective assistance of counsel, and to appeal. For the most part, however, he does not explain how the court's procedures violated each particular constitutional right. We discern no constitutional violation.[1]

---

[1] Garcia also asserts, without citing authority or developing an argument, that the trial court's procedures violated statutes addressing voir dire of prospective jurors. Because "we will not consider a bald legal proposition presented without argument or development," we do not consider his statutory claims unless

3

## A. Additional Facts

¶ 7 "COVID-19, the highly contagious and potentially deadly illness caused by the novel coronavirus, has triggered a global pandemic the likes of which we haven't experienced in over a century." *People v. Lucy*, 2020 CO 68, ¶ 1. The pandemic has led to an "unparalleled public health crisis" and "has turned our lives upside down." *Id.* at ¶¶ 1, 34. As pertinent here, the COVID-19 pandemic has significantly impacted our judicial system, created "innumerable challenges" for courts to confront, and made it difficult to hold jury trials in criminal cases. *People v. Hernandez*, 2021 CO 45, ¶ 44; *Lucy*, ¶ 34.

¶ 8 In response to the COVID-19 pandemic, the Chief Justice of the Colorado Supreme Court issued multiple orders about the operation of jury trials. As of June 15, 2020, all jury trials were barred through August 2, 2020. *See* Office of the Chief Justice, Updated Order Regarding COVID-19 and Operations of Colorado State Courts (June 15, 2020), https://perma.cc/6KYD-FJMF. The

---

otherwise noted. *People v. Rios*, 2020 COA 2, ¶ 7 n.1; *see also* C.A.R. 28(a)(7)(B); *People v. Simpson*, 93 P.3d 551, 555 (Colo. App. 2003).

4

Chief Justice granted an exemption, however, to allow two test trials in Denver, one of which was Garcia's. Thus, Garcia's trial took place during the early months of the pandemic — in July 2020 — and was the first jury trial to take place in person in Denver after the pandemic began.

¶ 9 The trial court created a safety plan in consultation with health officials and approved by the Chief Justice. According to the plan, everyone in the courtroom would be masked during the trial. The plan followed the Governor's state-wide mask mandate in force at the time of Garcia's trial, which did not provide exceptions for juries. *See* Colo. Exec. Order No. D 2020 138 (July 16, 2020), https://perma.cc/SZG3-K9B3. The impaneled jury was to be seated throughout the courtroom gallery to ensure social distancing, and the parties would be seated at tables perpendicular to the judge on either side of the court room. This arrangement would result in some jurors sitting in line with or slightly behind Garcia. *See infra* Appendix.

¶ 10 Garcia filed a written objection to holding the jury trial in July 2020, raising multiple concerns with the court's COVID-19 safety

protocols. He also moved for a mistrial during the hearing on his written objections.

¶ 11 The court denied the mistrial motion and Garcia's objections, explaining, "The Court believes that it has taken all the appropriate precautions, and if there's anything further that we can help with, we will – we'll provide those." After further consideration, the court permitted trial witnesses to remove their masks while testifying and to use face shields instead.

### B. Requiring Jurors to Wear Face Masks

¶ 12 First, Garcia contends that requiring prospective jurors to wear face masks during voir dire undermined the parties' and the court's ability to observe each juror's demeanor, thereby preventing defense counsel from effectively exercising challenges for cause and peremptory challenges. Second, he argues that requiring impaneled jurors to wear masks during the rest of the trial prevented defense counsel from assessing the jurors' reactions and making effective strategic decisions. We do not discern constitutional error.

#### 1. Standard of Review

¶ 13 We review de novo whether a Confrontation Clause violation, or other constitutional violation, occurred. *See Hernandez*, ¶ 18.

6

¶ 14    Trial courts, however, have broad "discretionary authority over the conduct and the scope of the voir dire examination." *People v. Flockhart*, 2013 CO 42, ¶ 37; *see also People v. Harlan*, 8 P.3d 448, 462 (Colo. 2000), *overruled on other grounds by People v. Miller*, 113 P.3d 743 (Colo. 2005).  Therefore, a trial court's decisions about voir dire procedures will not be disturbed absent an abuse of discretion.  A trial court's management of the courtroom is also reviewed for an abuse of discretion.  *Makeen v. Hailey*, 2015 COA 181, ¶ 38.  An abuse of discretion occurs when the trial court's decision is manifestly arbitrary, unreasonable, unfair, or based on an erroneous understanding of the law.  *People v. Gutierrez*, 2018 CO 75, ¶ 11.

¶ 15    The People concede that Garcia preserved all his objections to the trial court's requirement that the jurors wear masks.  We are not so sure.  Because we do not discern error, however, resolving this preservation question is immaterial to our analysis.

### 2.    Analysis

¶ 16    Whether requiring or permitting jurors to wear masks during trial violates a defendant's constitutional rights appears to be a matter of first impression in Colorado.  We join the several courts

from other jurisdictions that have considered this question and have concluded that such precautions in the face of the COVID-19 pandemic do not violate a defendant's constitutional rights.

¶ 17 With respect to prospective jurors wearing masks during voir dire, Garcia focuses on the alleged impact on his right to a fair and impartial jury (thus, implicating his right to due process). Our analysis adopts the same focus.

¶ 18 A criminal defendant has a constitutional right to a trial before an impartial jury. *People v. Rodriguez*, 914 P.2d 230, 260 (Colo. 1996). The jury selection process is designed to produce such a fair jury. *People v. Lefebre*, 5 P.3d 295, 300 (Colo. 2000), *overruled on other grounds by People v. Novotny*, 2014 CO 18, *and abrogated on other grounds by Vigil v. People*, 2019 CO 105. That is, the purpose of voir dire examination is "to enable counsel to determine whether any prospective jurors are possessed of beliefs which would cause them to be biased in such a manner as to prevent the [defendant] from obtaining a fair and impartial trial." *Rodriguez*, 914 P.2d at 260 (citation omitted); *see People v. Samuels*, 228 P.3d 229, 243 (Colo. App. 2009). But voir dire is not itself a constitutional right. *Lefebre*, 5 P.3d at 300; *see People v. O'Neill*, 803 P.2d 164, 169

(Colo. 1990). Rather, voir dire "is a tool that the parties use for the purpose of revealing and addressing bias in potential jurors." *Lefebre*, 5 P.3d at 300.

¶ 19 Garcia maintains that the jurors' masks interfered with voir dire because the masks impeded the court's and the parties' ability to assess each juror's demeanor. We acknowledge that assessing a juror's demeanor can be useful while considering the juror's responses to questions or instructions. *See Marko v. People*, 2018 CO 97, ¶ 21 (noting that a trial court must evaluate a prospective juror's responses, demeanor, and body language when ruling on a challenge for cause); *People v. Beauvais*, 2017 CO 34, ¶ 31 (recognizing that the demeanor of challenged jurors and challenging attorneys may be relevant to challenges based on *Batson v. Kentucky*, 476 U.S. 79 (1986)). Even so, a mask covering a juror's nose and mouth does not make it impossible to assess the juror's demeanor. The ability to see a juror's nose and mouth is not essential for assessing credibility because "[d]emeanor consists of more than those two body parts" and "includes the language of the entire body." *United States v. Crittenden*, No. 20-CR-7, 2020 WL 4917733, at *7 (M.D. Ga. Aug. 21, 2020) (unpublished opinion); *see*

9

*United States v. Tagliaferro*, 531 F. Supp. 3d 844, 851 (S.D.N.Y. 2021); *United States v. Trimarco*, No. 17-CR-583, 2020 WL 5211051, at *5 (E.D.N.Y. Sept. 1, 2020) (unpublished opinion); *Guerin v. Commonwealth*, ___ S.W.3d ___, ___, 2022 WL 5265083, at *2 (Ky. Ct. App. 2022).

¶ 20 During questioning of prospective jurors who are masked, counsel and the court can still observe the jurors' body language, tone of voice, eye contact, and other elements of their demeanor. Not surprisingly, then, "[a]ll courts that have considered this question so far have universally reached the conclusion that a defendant can still assess a juror's credibility and demeanor during both voir dire and trial while the juror is wearing a face mask." *United States v. Schwartz*, No. 19-20451, 2021 WL 5283948, at *2 (E.D. Mich. Nov. 12, 2021) (unpublished opinion) (collecting cases); *Guerin*, 2022 WL 5265083, at *2.

¶ 21 On a related note, Garcia "cites no authority (nor are we aware of any) holding that defendants have a constitutional right to see jurors' uncovered facial expressions during trial." *United States v. Smith*, No. 21-5432, 2021 WL 5567267, at *2 (6th Cir. Nov. 29, 2021) (unpublished opinion); *see United States v. Thompson*, 543 F.

Supp. 3d 1156, 1164 (D.N.M. 2021) ("[T]he Court is aware of no authority, nor has Mr. Thompson cited any, holding that the Sixth Amendment right to an impartial jury or Due Process demand that the defendant have unimpeded visual access to prospective jurors' facial expressions during jury selection.").[2]  Although a defendant ordinarily must be able to see and hear a prospective juror's answers to questions, and a person's facial expressions play a role in nonverbal communication, the relevant case law does not "impart constitutional significance to the ability to view a potential juror's entire face." *Prince v. State*, ___ A.3d ___, ___, 2022 WL 14707014, at *9 (Md. Ct. Spec. App. 2022).

¶ 22    Moreover, even if the prospective jurors' masks made assessing their demeanor marginally more difficult, both the defense and the prosecution were equally burdened by this challenge.  The jurors "were masked for all parties and the court, and the marginal diminution of everyone's ability to see the lower

---

[2] Garcia's reliance on *Marko v. People*, 2018 CO 97, ¶ 21, is misplaced because the supreme court in that case simply explained that, when ruling on a challenge for cause, a trial court must evaluate a prospective juror's responses, demeanor, and body language throughout the voir dire.  The supreme court did not hold that a juror's entire face must be visible throughout voir dire.

halves of the potential jurors' faces didn't affect the answers they gave or the court's ability to evaluate and rule on motions to exclude them." *Id.*; *see also Smith*, 2021 WL 5567267, at *3 (noting that the face mask requirement "applied with equal force to both parties").

¶ 23    So while the mask requirement was not ideal, it was a reasonable exercise of the trial court's discretion to manage voir dire in light of the daunting challenges of the COVID-19 pandemic. As noted, the pandemic "presented innumerable challenges to the important work of trial courts throughout Colorado," and courts had to adapt new ways to continue court operations. *Hernandez*, ¶ 44. The trial court's procedures were far from arbitrary; they reflected careful consideration of governing safety and health measures during "an unprecedented public health crisis." *Lucy*, ¶ 16; *see Commonwealth v. Davis*, 273 A.3d 1228, 1242 (Pa. Super. Ct. 2022); *Prince*, 2022 WL 14707014, at *9 ("[I]t was not unreasonable for the court to observe the constraints posed by the COVID-19 pandemic and the paramount importance of public health and safety.").

¶ 24     Finally, and for similar reasons, we reject Garcia's claim that requiring the impaneled jury to wear masks during opening statements, the presentation of evidence, and closing arguments violated his constitutional rights.  Garcia says the masks prevented defense counsel "from assessing the jury's reaction to the evidence" and denied defense counsel "sufficient information to make effective strategic and tactical decisions during the trial."

¶ 25     Once again, however, Garcia's arguments rest on the notion that it is impossible to assess a juror's demeanor without seeing the juror's nose and mouth.  We reject that notion, as have other courts that have considered the question in the context of impaneled jurors' masks during the trial.  *See Schwartz*, 2021 WL 5283948, at *2; *Trimarco*, 2020 WL 5211051, at *5; *see also Crittenden*, 2020 WL 4917733, at *7 (addressing a similar issue with respect to masked witnesses).  Indeed, Garcia does not identify which tactical decisions of his counsel were allegedly affected by the jurors' masks.  "Mere possibilities do not give rise to Constitutional violations, especially where they are as speculative as those alleged here."  *Tagliaferro*, 531 F. Supp. 3d at 852.

¶ 26    In sum, we discern no error in the trial court's decision to require prospective and impaneled jurors to wear masks during jury selection and at trial.

### C.    Seating of Impaneled Jurors

¶ 27    Garcia next raises two arguments related to the seating arrangement in the courtroom in response to the COVID-19 pandemic. He argues that seating the impaneled jurors in the gallery during the trial violated his constitutional rights because some jurors could not see his face during the entire trial. He also argues that some jurors were seated farther away from the witness stand than in a typical trial, reducing their ability to evaluate the witnesses' demeanor. Although Garcia asserts generally that this arrangement violated a host of his constitutional rights, he cites authority dealing with only his right to confrontation. Hence, we limit our analysis to the confrontation right.

### 1.    Jurors' Ability to Observe Garcia's Face

¶ 28    To reiterate, we review de novo a possible Confrontation Clause violation, and we review for an abuse of discretion the trial court's management of the courtroom, including its arrangement. *See Makeen*, ¶ 38.

¶ 29    Garcia maintains that seating some jurors where they could not see his face was improper because he was "entitled to have the jury be able to view [his] demeanor during witness testimony." He cites *People v. Boykins*, in which a division of this court concluded that "the right to cross-examine witnesses is an indispensable component of the Confrontation Clause, and includes the right of an accused to have the jury observe his or her demeanor." 140 P.3d 87, 92 (Colo. App. 2005). In support of the proposition that a defendant's right to confront witnesses also includes the right to have the jury observe the defendant's demeanor, however, the division cited only Justice Kennedy's concurring opinion (joined by no other justice) in *Riggins v. Nevada*, 504 U.S. 127, 142 (1992). The accuracy of this proposition is debatable. *See United States v. Petit*, 496 F. Supp. 3d 825, 828 (S.D.N.Y. 2020) ("In actuality, there is no such right [to have the trier of fact observe the defendant throughout trial], and the only authority defendants cite in its support is a non-precedential concurring opinion by Justice Kennedy in *Riggins* . . . ."); *cf. Smith*, 2021 WL 5567267, at *3 (remarking that it is "quite a stretch" to argue that the right to see jurors' facial expressions during trial is on par with the right to

confront the witnesses for the prosecution, particularly given that the alleged right to observe jurors' noses and mouths is not explicit in the Constitution).

¶ 30 Still, assuming without deciding that a defendant's confrontation right includes the right to have the jury observe the defendant's demeanor, such a right is not absolute. Although the Confrontation Clause reflects a preference for face-to-face confrontation, this preference must occasionally give way to considerations of public policy and the necessities of the case. *Hernandez,* ¶ 20. In the context of a witness's testimony, for instance, "the right may be satisfied without face-to-face confrontation 'where denial of such confrontation is necessary to further an important public policy' and where the testimony's reliability is otherwise assured." *Id.* (quoting *Maryland v. Craig,* 497 U.S. 836, 850 (1990)).

¶ 31 "Accordingly, observation of demeanor by the jury cannot be an irreducible constitutional requirement and must be subject to exception in certain circumstances." *Crittenden,* 2020 WL

4917733, at *7.[3] Like the mask requirement, the positioning of the jurors in the gallery here furthered an important public policy — ensuring the safety of everyone in the courtroom in the midst of an extraordinary global pandemic by having jurors sit apart. *Id.* at *6; *see Tagliaferro*, 531 F. Supp. 3d at 850 ("[E]ven if physical confrontation issues are implicated, the [court's] mask protocol fits comfortably within the public policy exception of the Confrontation Clause and therefore does not offend the Sixth Amendment."). Indeed, our supreme court has recognized that maintaining the safety of all court users in light of the health concerns posed by COVID-19 is an important public policy that may justify some limitations on a defendant's confrontation right. *See Hernandez*, ¶¶ 24-27 ("[P]ermitting the prosecution to appear, and the witnesses to testify, at [an immunity hearing] via WebEx does not amount to a violation of Hernandez's confrontation right."); *see also Roman Cath. Diocese v. Cuomo*, 592 U.S. ___, ___, 141 S. Ct. 63, 67 (2020)

---

[3] We also note that even jurors seated behind and to the side of Garcia could assess his demeanor to some degree because, as discussed, demeanor consists of more than facial expressions.

17

("Stemming the spread of COVID-19 is unquestionably a compelling interest . . . .").

¶ 32    Therefore, the limitation on some jurors' ability to see Garcia's entire face during the trial did not violate his right to confrontation.

### 2.    Jurors' Ability to Observe Witnesses

¶ 33    Garcia also argues that, because the jury sat in the gallery, some jurors were up to eight feet farther from the witnesses than "[u]nder normal circumstances." He says this distance "likely negatively affected" those jurors' ability to evaluate the witnesses' demeanor.

¶ 34    Even accepting as true Garcia's assertions about the distances here as compared to those in "normal circumstances," we see no constitutional violation. This social distancing policy did not deprive Garcia of meaningful cross-examination. The witnesses were not masked during their testimony, and Garcia does not allege any impediment to the jurors' ability to hear the witnesses. *See Tagliaferro,* 531 F. Supp. 3d at 850 ("[B]ecause witnesses will testify using courtroom microphones, there will be no impediment to

audibility for the jurors who are seated in the public gallery.").[4]  On

the contrary, the record reveals that the extra distance did not

impact the jurors' ability to observe testifying witnesses because the

trial court repeatedly asked jurors if they could see and hear the

witnesses and no juror ever expressed any difficulties.

¶ 35      For these reasons, the court's decision to seat the jury

throughout the gallery presented, at most, a minimal limitation on

the jurors' ability to assess the demeanor of witnesses at trial.

"Such a minimal disturbance [was] vastly outweighed by the

compelling interest in resuming criminal trials and the compelling

need to do so safely." *Petit*, 496 F. Supp. 3d at 829.  Hence, we do

not discern a violation of Garcia's constitutional rights.  *See id.* at

828-29 (discerning no Confrontation Clause violation where the

defendant alleged that "a juror sitting 60 or more feet from a

witness encased in a plexiglass cube with light reflecting off it and

---

[4] We offer no opinion on whether requiring witnesses to wear masks
during their testimony impairs a defendant's constitutional rights.

creating a glare likely cannot make an informed assessment of the witness's testimony").[5]

### III.    Selection of Prospective Jurors

¶ 36     Garcia contends that the trial court erred by not randomly seating potential jurors in the jury selection room.  He says this procedure violated his constitutional right to a fair and impartial jury that represents a fair cross-section of the community as well as statutory mandates related to jury selection.  We disagree.

¶ 37     Prospective jurors were identified by the time they checked in at the courthouse.  They were then assigned to seats in the jury selection room in the order that they checked in.  Garcia says this process made the potential jurors who arrived earlier, were seated in lower seat numbers, and were allegedly more inclined to convict a defendant (the "eager beavers," as he calls them) more likely to be

---

[5] As an overarching criticism, Garcia also maintains that the COVID-19 pandemic was foreseeable and, thus, the court system should have prepared for it.  Regardless of the accuracy of the premise that the pandemic was foreseeable, Garcia does not indicate what other measures the trial court here should have adopted in response.  Nor does he cite any authority holding that such other theoretical measures were constitutionally mandated.  Consequently, irrespective of whether the safety measures here were flawless, we discern no constitutional violation or abuse of discretion.

on the jury. According to Garcia, this prevented a fair "jury pool" because it was not a random selection process.

¶ 38    Garcia did not raise this objection below, and we see no error, much less plain error. *See People v. Walker*, 2022 COA 15, ¶¶ 57, 68 (explaining that we review unpreserved claims for plain error and setting forth the plain error standard).

¶ 39    The Colorado Uniform Jury Selection and Service Act outlines the procedures for selecting potential jurors from the community. *See* §§ 13-71-107 to -110, C.R.S. 2022. As Garcia acknowledges, nothing in this act dictates how a court must seat jurors after they check in for jury duty. Thus, there was no statutory error. And he cites no authority and develops no argument for his assertion that the jury selection process here violated his constitutional rights. Because we will not consider a bald legal proposition presented without argument or development, we do not address this claim any further. *People v. Rios*, 2020 COA 2, ¶ 7 n.1.

IV.    Garcia's Presence at Jury Selection

¶ 40    Garcia asserts that he was denied his right to be present for jury selection. The record, however, refutes this contention and shows that he was present for voir dire and other parts of the trial.

21

Each transcript of the proceedings shows that Garcia was present. Although he was late to some proceedings, the trial court waited for him to arrive before beginning the substantive part of the proceedings.

## V. Sufficiency of the Evidence

¶ 41 Garcia next contends that the evidence was insufficient to support his convictions. We are not persuaded.

¶ 42 In analyzing the sufficiency of evidence, we consider whether the relevant evidence, both direct and circumstantial, when "viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt." *People v. Harrison*, 2020 CO 57, ¶ 32 (citation omitted).

¶ 43 According to Garcia, the prosecution presented insufficient evidence of (1) his identity as the person who attempted to sell Kerr's property at the pawnshops and (2) the value of the items.

### A. Garcia's Identity

¶ 44 As charged here, a person commits theft if the person "knowingly obtains, retains, or exercises control over anything of value of another without authorization" and "[i]ntends to deprive the

22

other person permanently of the use or benefit" of the thing of value. § 18-4-401(1)(a), C.R.S. 2022. A customer who knowingly gives a pawnbroker false information, as defined by statute, commits a criminal offense. § 29-11.9-104(5), C.R.S. 2022.

¶ 45 Garcia argues that, because neither pawnbroker identified him in court as the seller of Kerr's property, "there was only circumstantial evidence of any purpose to deprive Dr. Kerr of her belongings." But such intent may be proved by either direct *or* circumstantial evidence, *see Harrison*, ¶ 32, and there was ample evidence that Garcia was the person trying to sell Kerr's property.

¶ 46 Both Kerr and the detective who interviewed Garcia identified Garcia in court. Garcia admitted during the interview that he sold items belonging to Kerr at the pawnshops. The prosecution presented a surveillance video showing Garcia at one pawnshop. Both pawnshop owners testified about their interactions with a man named Kenneth Garcia who was selling property that the police later determined belonged to Kerr. The prosecution also presented

multiple pawnshop tickets from those sales that included the name Kenneth Garcia.[6]

¶ 47　　Moreover, the evidence showed that Garcia had items belonging to Kerr in his storage unit, and he admitted he was the only person with access to it.  True, in his police interview, Garcia asserted both that he did not know that the property belonged to Kerr *and* that he was planning to return it to her after storing it for safekeeping.  Yet he told Kerr that he did not know what happened to her property when she confronted him upon her return from vacation.

¶ 48　　Given all this, the evidence was more than sufficient to support the jury's findings that Garcia took Kerr's property with the intent to permanently deprive her of it and that Garcia gave false information to the pawnbrokers about that property.

---

[6] Although Garcia claims that the name Kenneth Garcia is common in Denver, no evidence admitted at trial supports this claim. Moreover, the prosecution presented evidence showing more than that the tickets bore the same name as Garcia's.  *Cf. People v. Cooper*, 104 P.3d 307, 312 (Colo. App. 2004) (noting that such documentary evidence might be insufficient in a habitual criminal trial).  The other evidence pointing to Garcia was abundant.

## B.    Value of Stolen Property

¶ 49    To prove theft as a class 4 felony, the prosecution must demonstrate that the value of the stolen property is $20,000 or more but less than $100,000.  § 18-4-401(2)(h).  To prove theft from an at-risk person as a class 3 felony, the prosecution must demonstrate that the value of the stolen property is at least $500.  § 18-6.5-103(5), C.R.S. 2022.[7]

¶ 50    To prove this value, the prosecution must present "competent evidence of the reasonable market value of the item at the time of the commission of the alleged offense."  *People v. Jaeb*, 2018 COA 179, ¶ 40.  "Market value is what a willing buyer will pay in cash to the true owner for the stolen items."  *Id.*

¶ 51    In this case, the prosecution presented an expert, Dewey Smith, who testified about the value of the stolen items.  Garcia argues that this evidence was not sufficient to establish the value because Smith's appraisal was speculative.  According to Garcia, Smith's opinion was based on photographs of some items in pristine

---

[7] Kerr was an "[a]t-risk adult" because she was seventy years of age or older at the time of the crimes.  § 18-6.5-102(2), C.R.S. 2022.

condition rather than a review of the missing items in their actual condition.

¶ 52 During his testimony, Smith discussed deterioration and how the actual condition of an item may impact its value. He testified that he considered each item's condition and potential deterioration when determining the value of all the items. Most significantly, Smith testified that, even if all the items he considered had been in "poor" condition — the worst condition ranking he used during his evaluation — the market value of the items listed as stolen by Kerr would still have exceeded $20,000.

¶ 53 This evidence was sufficient to demonstrate that the value of the property met the statutory thresholds at issue here.

VI. Expert Witness Qualification

¶ 54 Garcia asserts that the trial court erred "by admitting the testimony of an unqualified 'expert' as to value," referring to Smith's testimony. But while Garcia points to various facts and procedural history surrounding Smith's testimony, as well as to case law pertaining to whether a witness is qualified as an expert, Garcia makes no attempt to apply the law to the facts here. He merely offers a description of the applicable law and declares, without

analysis, that the trial court erred. Because Garcia provides no analysis or argument to support his conclusion, we conclude that he has not adequately presented this issue, and we decline to consider it. *See People v. Hebert*, 2016 COA 126, ¶ 17; *People v. Hill*, 228 P.3d 171, 176 (Colo. App. 2009).

## VII. Alleged Prosecutorial Misconduct

¶ 55 Finally, Garcia maintains that the trial court erred by failing to address prosecutorial misconduct during voir dire, opening statements, and closing arguments. He is mistaken.

### A. Relevant Law

¶ 56 In reviewing a claim of prosecutorial misconduct, "we consider whether the prosecutor's conduct was improper and whether any impropriety requires reversal." *Walker*, ¶ 27. "Whether a prosecutor's statements constitute misconduct is generally a matter left to the trial court's discretion." *Domingo-Gomez v. People*, 125 P.3d 1043, 1049 (Colo. 2005). We will not disturb the trial court's rulings on alleged misconduct absent a showing of an abuse of discretion. *Walker*, ¶ 27.

¶ 57 Garcia's claims are unpreserved because he did not raise them in the trial court. Where a claim of error is not preserved, we may

reverse only if plain error occurred. *Hagos v. People*, 2012 CO 63, ¶ 14. A trial court's failure to address alleged prosecutorial misconduct can be plain error only if the conduct was "flagrantly, glaringly, or tremendously improper." *Walker*, ¶ 28 (citation omitted); *see also Hagos*, ¶ 23 (reversals on plain error review "must be rare to maintain adequate motivation among trial participants to seek a fair and accurate trial the first time").

## B. Application

¶ 58      Garcia alleges four instances of prosecutorial misconduct.

¶ 59      First, during voir dire, the prosecutor told prospective jurors that "Mr. Garcia's asked for a trial." Garcia argues that this comment encouraged jurors to blame him for having to attend jury duty during a pandemic and that this comment was a misrepresentation of the record because Garcia had agreed to a plea deal (which the trial court had rejected). In context, however, the prosecutor simply acknowledged that this case presented one of the first jury trials conducted after the start of the pandemic. The prosecutor also emphasized that "a trial is something that is the cornerstone of the criminal justice system" and Garcia was "entitled to have a trial." And both parties were able to question prospective

jurors about whether they would be comfortable serving on the jury during the COVID-19 pandemic. We thus see no real danger that jurors interpreted the prosecutor's anodyne comment as placing blame on Garcia or suggesting that they should harbor bias against him as a result.

¶ 60 Second, in opening statement, the prosecutor referred to Kerr as "our victim" before immediately clarifying that "I guess a legal term would be our alleged victim at this point." The prosecutor later again referred to Kerr as "our victim." A prosecutor's reference to an alleged victim as "our victim," however, is not misconduct per se, and nothing about the context here renders it such. *See People v. Williams*, 961 P.2d 533, 536 (Colo. App. 1997) (holding that a prosecutor's references to "our victim," "my victim," and "your witnesses" were not improper), *rev'd on other grounds*, 984 P.2d 56 (Colo. 1999).

¶ 61 Third, in closing, the prosecutor argued the following about whether the evidence showed reasonable doubt about Garcia's guilt:

> Folks, our argument to you, if you were to find
> reasonable doubt here, you would have no
> choice but to come up with some — but to
> speculate or to formulate some sort of reason
> to let the defendant off the hook, because the

29

> evidence that you have heard, that has been
> accepted by the court, that's in the binder and
> it's on those tapes, shows that there is no
> reasonable doubt. There is no hesitation here.
> There's nothing to imagine, there's nothing to
> speculate about. The defendant is guilty.

According to Garcia, the prosecutor improperly asserted that the jury would need to speculate in order to find him not guilty. But in context, the prosecutor merely argued that the evidence did not support the defense's theory, which is not misconduct. *See Walker*, ¶ 41 ("Commenting on the lack of evidence supporting a defense theory does not shift the burden of proof.").

¶ 62 Fourth, Garcia says in his opening brief that the prosecutor "simply made up evidence out of thin air" during closing argument by remarking that Garcia had reportedly hired "strippers" and "former strippers," as well as people named "Alex" and "Katie," to work for him on Kerr's property. As Garcia acknowledges in his reply brief, however, the prosecutor referred to information that came into evidence through Garcia's police interview. It is not improper for a prosecutor to comment on the evidence. *See People v. Conyac*, 2014 COA 8M, ¶ 132.

¶ 63 We therefore reject the claims of prosecutorial misconduct.

30

## VIII. Conclusion

¶ 64    The judgment is affirmed.

JUDGE WELLING and JUDGE JOHNSON concur.

Key:

Blue dots: Jurors
Green dots: Parties and Witnesses
Red dots: Court Staff
Orange dots: Members of the Public

# Appendix

